## 𝕸𝖞𝖙𝖍𝖊𝖛𝖎𝖑𝖑𝖊.

VIRGINIA-WESTERN POWER COMPANY V. CITY OF CLIFTON
FORGE.

VIRGINIA-WESTERN POWER. COMPANY V. CITY OF BUENA
VISTA.

VIRGINIA-WESTERN POWER COMPANY V. TOWN OF
COVINGTON.

VIRGINIA-WESTERN POWER COMPANY V. TOWN OF
LEXINGTON.

June 12, 1919.

Absent, Prentis and Burks, J.J.

1. MUNICIPAL CORPORATIONS—*Electric Light and Power Company—
Franchises—Fixing Rates—Impairment of Obligation of Con-
tracts.*—Where municipalities were expressly vested at the
time of granting franchises to an electric light and power com-
pany with unlimited authority to contract with the grantee of
such franchises on the subject of fixing the rates which might
be charged for the services rendered the public thereunder dur-
ing the whole of the franchise periods, the rates as fixed in the
franchises are irrevocable during the franchise periods, with-
out the consent of the municipality, as well as of the holder of
the franchise, to a change, under article 1, section 10, of the
Constitution of the United States, which prevents the impair-
ment of the obligation of contracts.

2. IMPAIRMENT OF OBLIGATION OF CONTRACTS—*Franchise as Con-
tract—Franchise Granted by Municipality.*—The grant of a
right to a public utility company, such as a gas or electric
light company, to supply the wants of the inhabitants of a
municipality and to use the streets upon condition of the per-
formance of its service by the grantee, is a grant of a fran-
chise vested in the State in consideration of the performance
of a public service, and, after performance by the grantee, is
a contract protected by the Constitution of the United States
against State legislation to impair it, and the principle is the
same whether the franchise is granted directly by the State or

by a municipality authorized by the State to do so, provided the authority is expressly conferred upon the municipality.

3.   POLICE POWER—*Rates of Charges for Public Service—Power of Municipalities.*—It is true that the power to fix and regulate rates of charges for a public service, just as is the power to tax or to exempt from taxation, is a police power, which is an attribute of sovereignty inherent in the State. And the rule is inflexible that municipalities have no inherent powers in such matters. In matters concerning the police power municipalities cannot exceed the authority delegated to them. They can exercise such power only when they have been authorized so to do by the State, by constitutional ordinance or statutory enactment, and even then only to the extent they may be thus expressly authorized.

4.   POLICE POWER—*Rates of Charges for Public Service—Power to Regulate a Continuing Power.*—The power to regulate rates of charges for a public service is considered, normally, to be a continuing power to meet changing conditions of the future which cannot be foreseen. The abrogation of such continuing power is never to be presumed. The purpose on the part of the State to abrogate it or to authorize a municipality to abrogate it, even for a limited time, as for a term of years which may be covered by a franchise, is never to be assumed, for that is an extinguishment *pro tanto* of such continuing power of government. A franchise contract which fixes irrevocably rates for the period covered by the franchise, unless a change thereof is consented to both by the grantor and grantee or holder of the franchise, does extinguish such governmental power *pro tanto.*

5.   MUNICIPAL CORPORATIONS—*Fixing Charges of Public Utility Company—Power under Section 124 of the Constitution of 1902.*— Section 124, Constitution of 1902, and section 1033-d, Code of 1904, confer upon municipalities the absolute power to prevent public utility corporations, such as an electric light and power company, from doing business within the municipality, by refusal of their consent thereto. This power is absolute because no limitation is imposed upon it. Consequently the municipality may impose any condition it chooses upon its consent aforesaid, however unreasonable. It results from this that such power includes the power in municipalities to make a stipulation as to what the rate charges of the utility corporation shall be during the whole franchise period, as a condition upon which the consent is given.

6.   MUNICIPAL CORPORATIONS—*Fixing Charges of Public Utility Company—Power under Section 124 of the Constitution of 1902— Power Not a Power to Contract—Impairment of Obligation of Contracts.*—But the power referred to in the preceding sylla-

bus is not necessarily to be regarded as a power of contract. It is a power to impose conditions upon a consent of municipalities which they have the absolute right to withhold altogether or to grant subject to such conditions as they may arbitrarily impose, but it is not, strictly speaking, a power to contract. On the contrary, under the rule that the State is not presumed to abrogate its right to regulate rates of public utility companies, such power is not regarded as a power of contract. And, in the absence of other plain expression, the continuing power of the State to supervise and regulate rate charges for the future, to the end that they may be kept reasonable and just under changing conditions, will not be held to have been surrendered.

7. MUNICIPALITIES—*Power to Fix Rates of Public Utility Companies—Section 156 (b) of the Constitution of 1902.*—Section 156 (b) of the Constitution of 1902 does not *ex proprio vigore* have the effect of conferring on municipalities the authority to fix rates by contract. And the saving clause therein **has** reference to the authority to regulate rates **and not** to the fixing of rates irrevocably by contract.

8. PUBLIC UTILITY COMPANIES—*Power to Regulate Rates—Dormant Until Act of 1914.*—The general power of regulating rates of public utility companies was dormant in this State until the act of 1914 (Acts 1914, p. 673). Although there may be some charters of municipalities in the State granting such supervisory power or restricting the municipal power to contract, there was no general statute enacted conferring such supervisory power upon municipalities, or restricting the municipal power to contract.

9. MUNICIPALITIES—*Power to Fix Rates of Public Utility Companies—Section 156 (c) of the Constitution of 1902.*—Section 156 (c) of the Constitution of 1902 does not confer on municipalities the authority to fix rates by contract.

10. MUNICIPALITIES—*Power to Fix Rates of Public Utility Companies—Section 125 of the Constitution of 1902.*—Under section 125 of the Constitution of 1902 and sections 1033-e and 1033-f, Code of 1904, municipalities have unlimited authority to contract with the grantee of a franchise to exercise a public utility on the subject of fixing the rates of charges thereunder during the whole of the franchise periods.

11. MUNICIPAL CORPORATIONS—*Rates Fixed by Franchise—Modification—Case at Bar.*—The franchises involved in the instant cases being contracts duly authorized, their provisions fixing modified by consent of both parties, the municipalities and the the rates to be charged for services rendered the public are binding during the franchise periods, unless and until they are

holder of the franchises. Inadequacy of the rates to enable the grantee of the franchise to render efficient service, due to unforseen change in economic conditions, will not excuse performance of its contract by the grantee of the franchise.

12. MUNICIPAL CORPORATIONS—*Franchise—Revocation—Impairment of Obligation of Contracts.*—Powers which are conferred upon municipalities by the legislature may be by the legislature revoked at any time; but such revocation can affect only the validity of future action of the municipalities under the revoked authority. On principle, contracts made by municipalities under delegated authority cannot differ from contracts made by any other agent upon the question of the effect of the revocation of the authority of the agent. The revocation of the authority comes too late to affect contracts previously made in accordance with the authority.

13. MUNICIPAL CORPORATIONS—*Public Utilities — Contracts as to Rates.*—The authorities recognize no difference in the power of a municipality by franchise provisions to make a contract binding on public utility companies with respect to rates to be charged the consuming public within the municipal limits from those with respect to rates to be charged the municipality itself for light or water service to it, or the like, for its streets, public buildings, etc. The municipality is regarded as acting in the exercise of its *business* powers in making both of such character of contracts.

14. MUNICIPAL CORPORATIONS—*Franchises—Contracts with Public Utilities.*—The municipal authority to make contracts with respect to rates to be charged public utilities, although they are business contracts, must be expressly conferred by constitutional or legislative authority, otherwise the contracts will not be irrevocable.

15. CONSTITUTIONAL LAW—*Construction—Sections 164 and 125.*— Sections 164 and 125 of the Constitution of 1902 must be construed together, and, when so construed, section 164 cannot be held to prohibit what the preceding section 125 expressly permits to be done, namely, a contract between a public utility company and a municipality fixing the rates that may be charged by the public utility company during the period of the franchise.

Appeal from the State Corporation Commission.

*Affirmed.*

The above-entitled cases are separate appeals from a similar order of the State Corporation Commission in each

case refusing to approve the schedule of rates hereinafter mentioned so far as they apply to services within the corporate limits of the cities and towns which are the defendants in error before us, on the ground that, such rates being in excess of those agreed upon in the franchises hereinafter mentioned, the commission is without authority or jurisdiction to approve of them.

The plaintiff in error, the Virginia-Western Power Company (hereinafter designated as such, or as the company), is a public service corporation, and operates a public utility, as defined by statute, and, in the operation of such utility, the company generates and furnishes electric current to its customers for light, power and heating purposes. It has for some years been furnishing electric current to the public as its customers, within the corporate limits of the defendant in error cities and towns, at rates of charges fixed for the respective franchise periods by the respective franchises giving the authority to do such business in such municipalities, to the extent that such rates of charges are fixed at all by such franchises. None of such franchises fixes any rates of charges for such current for heating purposes. In Clifton Forge the maximum rates of charges to the customers aforesaid therein, other than the municipality, for said current are fixed by the franchise for lighting purposes only. In Buena Vista, Covington and Lexington the rates of charges to said customers, other than the municipalities, for such current are fixed by the franchises for lighting and power purposes only—maximum rates being so fixed in Buena Vista, maximum and minimum rates in Lexington, and specific and minimum rates in Covington. Such rates of charges as are fixed by the franchises purport to be irrevocably fixed thereby for the whole period of the respective franchises and none of such periods have yet expired.

None of the defendants in error have any provisions in

their charters which are claimed to give any municipal authority on the subject of irrevocably fixing the rates aforesaid during the whole franchise period, except the town of Lexington. That has in its charter the following provision:

"* * * but no company shall occupy, with its works or any appurtenances thereof, the streets, sidewalks or alleys of the town without the consent of the mayor and council, duly entered upon its records."

The franchises aforesaid were all granted after the sections of the Constitution of Virginia of 1902 and the statutes presently to be referred to and quoted went into effect.

Sections 124 and 125 of said Constitution, so far as material, provide as follows:

"Sec. 124. Consent of corporate authorities necessary to use of streets, alleys or public grounds by certain companies or persons.—No * * * electric heating, electric light or power * * * company, nor any corporation, association, person or partnership, engaged in these or like enterprises, shall be permitted to use the streets, alleys or public grounds of a city or town without the previous consent of the corporate authorities of such city or town.

"Sec. 125. Sale of corporate property and granting of franchises by cities and towns.—The rights of no city or town in and to its * * * streets, avenues, parks, bridges and other public places, and its gas * * * and electric works shall be sold except by an ordinance or resolution passed by a recorded affirmative vote of three-fourths of all members elected to the council, or to each branch thereof when there are two, and under such other restrictions as may be imposed by law; * * * no franchise * * * shall be granted for a longer period than thirty years. Before granting any such franchise or privilege for a term of years, except for a trunk railway, the municipality shall first, after due advertisement, receive bids therefor publicly, in such manner as may be provided by law, and shall then

act as may be required by law.  *  *  *  *Every such grant shall  *  *  *  make adequate provision* by way of forfeiture of the grant, or otherwise, *to secure efficiency of public service at reasonable rates, and the maintenance of the property in good order throughout the term of the grant.* Nothing herein contained shall be construed as preventing the General Assembly from *prescribing additional restrictions on the powers of cities* and towns *in granting* franchises  *  *  *  or as repealing *any additional restrictions* now required in relation thereto in any existing municipal charter." (Italics supplied in the body of the last section quoted.)

Section 156 (b) of said Constitution confers upon the State Corporation Commission the power and duty of supervising, regulating and controlling certain corporations, as to which it is provided that "the authority of the commission  *  *  *  shall be paramount," but electric light and power companies are not among such corporations. As to such last-named companies, however, it is provided in this section of the Constitution that the authority of the State Corporation Commission "to prescribe any other rules, regulations or requirements  *  *  *  shall be subject to the superior authority of the General Assembly to legislate thereon by general laws; provided, however, that nothing in this section shall impair the right which has heretofore been, *or may hereafter be, conferred by law* upon the authorities of any city, town or county to prescribe rules, regulations *or rates of charge* to be observed by any public service corporation *in connection with any service* performed by it *under a municipal* or county *franchise* granted by such city, town or county, so far as such services may be wholly within the limits of the city, town or county *granting the franchise.  *  *  *"*  (Italics supplied.)

Section 156 (c) of the said Constitution, so far as material, provides, in respect to the State Corporation Commission, as follows:

"* * * The commission may be vested with such additional powers and charged with such other duties (*not inconsistent* with this Constitution) as may be prescribed by law, in connection with the visitation, regulation or control of corporations, or with the *prescribing* and enforcing *rates* and *charges to be observed* in the conduct of any business *where the State has the right to prescribe the rates and charges* in connection therewith." (Italics supplied.)

Subsequent to the going into effect of the Constitution, the statutes contained in 1 Pollard's Code of Va., 1904, sections 1033-d, 1033-e and 1033-f were enacted.

Section 1033-d is precisely in the same language as section 124 of the Constitution, above quoted.

Section 1033-e is precisely in the same language as section 125 of the Constitution above quoted, except that the words "by the following section" are substituted for the words "by law," in that part of such section of the Constitution which has reference to the manner in which the bids for the franchise shall be received, and the following sentence is substituted for the last sentence of such section of the Constitution, namely: "Nothing herein contained shall be construed as repealing any additional restrictions now required in any existing municipal charter, in relation to the powers of cities and towns in granting franchises."

Section 1033-f provides that the ordinance proposing to make the grant of the franchise, after its terms have been fixed upon, shall be advertised; it also provides for the manner of advertising, receiving and acting on the bids for the franchise; and that "the highest and best bid" shall be accepted and that the ordinance granting the franchise shall be enacted "as advertised, without substantial variance except as to the insertion of the name of the successful bidder," with the power in the municipal authorities, however, "to reject a higher and accept a lower bid" if of opinion

that "some reason affecting the interest of the city or town makes it advisable so to do." Such statute also provides that "no amendment that releases the grantee, or his assignee, from the performance of any duty required by the ordinance granting the franchise, or *that authorizes* an *increase in the charges to be made* by such grantee or assignee, for the use by the public of the benefit of such franchise, shall be granted unless and until notice of such proposed amendment shall be given to the public" by certain advertisement prescribed in the statute. (Italics supplied.)

Such statute also contains the following provisions to secure the compliance both of the grantor and the grantee of the franchise with their obligations in the premises, namely: the grantee is required to "execute a bond, with good and sufficient security, in favor of the city or town, in such sum as the city or town shall determine, conditioned upon the construction and putting into operation and maintaining the plant or plants provided for in the franchise, right or privilege granted." And it is further provided that, "The corporation courts of the cities and the circuit courts of the counties in which the towns may be situated shall have jurisdiction by mandamus * * * to enforce compliance *by said cities or towns and by all grantees of franchises,* * * * *with all the terms and contracts* and *obligations of either party,* as contained in franchises." (Italics supplied.)

Such was the constitutional and statute law of the State when the franchises in question were granted. And such is the authority upon which is based the action of the municipalities aforesaid on the subject of fixing irrevocably during the whole periods covered by said franchises the rates of charges aforesaid.

The franchises were granted in accordance with said constitutional and statute law. They contained provisions purporting to fix said rates of charges, as aforesaid, irrevoc-

ably during the whole periods covered by the franchises, respectively. The franchises, with such provisions therein, were accepted and acted upon by the grantees thereof, the said plaintiff in error company and its predecessors, for a number of years.

Subsequently, the General Assembly (by Acts of 1914, p. 673, *et seq.*) enacted a statute which purports to confer upon the State Corporation Commission the authority, as it is claimed by the plaintiff in error, to regulate and change such rates of charges as those above mentioned, although purported to be irrevocably fixed by the franchises aforesaid during the respective periods covered by such franchises. The commission is given no jurisdiction, however, over rates charged the municipalities themselves for electric current. Such statute, among other things, provides that every such corporation as the plaintiff in error shall file with the State Corporation Commission schedules showing rates and charges made by it; and, further, among other things, provides, so far as material, in section 7 thereof, as follows:

"7. Commission to fix rates and regulations.—If, upon investigation, the rates * * * charges, schedules * * * of any public utility operating in this State shall be found to be unjust, unreasonable, insufficient * * *, the State Corporation Commission shall have power to fix and order substituted therefor such rate or rates * * * charges or schedules as shall be just and reasonable. * * *"

· And section 8 of such statute, so far as material, provides as follows:

"* * * the provisions of the Code of Virginia shall apply to the companies included herein, and whenever the two are inconsistent the law as embraced in the Code shall prevail."

The above-mentioned statutes, sections 1033-d, 1033-e and 1033-f were provisions of *Pollard's* Code of Virginia

of 1904, as aforesaid, when said act of 1914 was passed, and also when it went into effect.

Subsequently, to-wit, on March 18, 1918, the said company filed with the State Corporation Commission a schedule showing the rates of charges proposed to be made by it for furnishing electric current to the public, its customers, in all municipalities and rural sections served by it in Virginia (which municipalities include the cites and towns who are the defendants in error), such rates to be effective April 1, 1918, and superseding all rates theretofore in effect.

Such schedule contains uniform rates of charges for electric current for heating, lighting and power in municipalities. Such rates for lighting are in excess of the rates therefor allowed by the charters granted by all of the defendants in error. Such rates for power are in excess of the rates allowed by the charters granted by Buena Vista, Covington and Lexington. The other rates named in such schedule are not in conflict with the franchises aforesaid.

The issues in the cases before us arose upon separate petitions, filed by the defendants in error in the name of the Commonwealth at their relation on and before April 1, 1918, and before the State Corporation Commission made any investigation or took any action on said schedule, and upon the separate answers of the said company to such petitions. The answers raise no issues of fact except in the Clifton Forge case. In that case the answer alleges that the company is not furnishing electric current to the public throughout the corporate limits under the franchise granted by the city, but that in about one-half of such territory it is furnishing such current in the exercise of another right so to do. That issue of fact was not passed upon by the State Corporation Commission and is not involved before us on appeal.

*F. W. King* and *J. M. Perry,* for the appellant.

*O. B. Harvey, Jno. W. Bear, H. S. Rucker, Frank Moore, O. C. Jackson* and *R. C. Stokes,* for the appellees.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court:

The assignments of error raise the questions which will be passed upon in their order as considered below.

The controlling question in the cases before us is this—

[1]    1. Were the municipalities (the defendants in error), in the granting of the franchises involved in these cases, expressly vested at the time of the granting thereof with *unlimited authority to contract* with the grantee of such franchises on the subject of fixing the rates which might be charged for the services rendered the public thereunder during the whole of the franchise periods?

If so, because of article 1, section 10 of the Constitution of the United States, which prevents the impairment of the obligation of contracts, it is firmly settled that the rates as fixed in the franchises are irrevocable during the franchise periods, without the consent of the municipality, as well as of the holder of the franchise, to a change. *Detroit* v. *Detroit, etc., R. Co.,* 184 U. S. 368, 22 Sup. Ct. 410, 46 L. Ed. 592; *New Orleans Gaslight Co.* v. *Louisiana Light, etc., Co.,* 115 U. S. 650, 6 Sup. Ct. 252, 29 L. Ed. 516; *New Orleans Waterworks Co.* v. *Rivers,* 115 U. S. 674, 6 Sup. Ct. 273, 29 L. Ed. 525; *St. Tammany Waterworks Co.* v. *New Orleans Waterworks Co.,* 120 U. S. 64, 7 Sup. Ct. 405, 30 L. Ed. 563; *Walla Walla* v. *Walla Walla Water Co.,* 172 U. S. 1, 19 Sup. Ct. 77, 43 L. Ed. 341; *Cleveland* v. *Cleveland, etc., R. Co.,* 194 U. S. 517, 24 Sup. Ct. 756, 48 L. Ed. 1102; *Cleveland* v. *Cleveland, etc., R. Co.,* 201 U. S. 529, 26 Sup. Ct. 513, 50 L. Ed. 854; *Los Angeles* v. *Los Angeles City*

*Water Co.*, 177 U. S. 558, 20 Sup. Ct. 736, 44 L. Ed. 886; *Omaha Water Co.* v. *City of Omaha*, 77 C. C. A. 267, 147 Fed. 1, 12 L. R. A. (N. S.) 736, 8 Ann. Cas. 614; *Boerth* v. *Detroit, etc., Gas Co.*, 152 Mich. 654, 116 N. W. 628, 18 L. R. A. (N. S.) 1197; *Pacific Railroad Co.* v. *Leavenworth*, 1. Dill. 393, Fed. Cas. No. 10649; *Northern, etc., R. Co.* v. *Baltimore*, 21 Md. 93; *Clarksburg Electric Light Co.* v. *City of Clarksburg*, 47 W. Va. 739, 35 S. E. 994, 50 L. R. A. 142, and note; *Louisville Home Tel. Co.* v. *City of Louisville*, 130 Ky. 611, 113 S. W. 855, 859; *Trustees, etc.*, v. *Jessup*, 162 N. Y. 122, 56 N. E. 538; McQuillin on Mun. Corp., sections 1733, 1738-9; *Columbus Ry., etc., Co.* v. *Columbus*, 249 U. S. 416, 39 Sup. Ct. 349, 63 L. Ed. —.

As said by the Supreme Court in the case of *Detroit* v. *Detroit, etc., R. Co., supra* (184 U. S. 368, 22 Sup. Ct. 410, 46 L. Ed. 592), on the subject of the authority of municipalities to make an irrevocable franchise contract fixing rates of charges of a street railway company: "* * * there can be no question in this court of the competency of a State legislature, unless prohibited by constitutional provisions, to authorize a municipal corporation to contract with a street railway company as to the rates of fare and so to bind during the specified period any future common council from altering or in any way interfering with such contract." Citing a number of the above-cited Supreme Court cases.

In *New Orleans Waterworks Co.* v. *Rivers, supra* (115 U. S. 674, 6 Sup. Ct. 273, 29 L. Ed. 525), it was held that a franchise allowing the company to fix water rates, but subject to the condition that its net profits should not exceed a certain per cent, was a contract protected by the Federal Constitution, which the State itself could not impair by revoking it, even though the revocation was attempted by the State Constitution adopted after the grant of the franchise and its acceptance by the grantee of it and action by the latter thereunder in performance of the contract. To the same effect are the cases of *St. Tammany Waterworks*

*Co.* v. *New Orleans Waterworks Co., supra* (120 U. S. 64, 7 Sup. Ct. 405, 30 L. Ed. 563), *and New Orleans Gaslight Co.* v. *Louisiana Light, etc., Co., supra* (115 U. S. 650, 6 Sup. Ct. 252, 29 L. Ed. 516).

[2]    As said in *Walla Walla* v. *Walla Walla Waterworks Co., supra* (172 U. S. 1, 19 Sup. Ct. 77, 43 L. Ed., at p. 345) : "* * * this court has too often decided for the rule to be now questioned that the grant of a right to supply gas or water to a municipality and its inhabitants through pipes and mains laid in the streets, upon condition of the performance of its service by the grantee, is the grant of a franchise vested in the State, in consideration of the performance of a public service, and, after performance by the grantee, is a contract protected by the Constitution of the United States against State legislation to impair it." Citing a number of cases.

And it is true, as also said in substance in the case last cited, that the principle involved is the same whether the franchise is granted directly by the State or by a municipality authorized by the State to do so, provided the authority is expressly conferred upon the municipality.

It is said, in substance, in *Los Angeles* v. *Los Angeles City Water Co., supra* (77 U. S. 558, 20 Sup. Ct. 736, 44 L. Ed., at p. 892) : It cannot be contended that it is not competent for the State to give municipalities the power to bind the State, so that such a contract cannot be revoked by the State after it has been entered into by the municipality by granting the franchise and the grantee thereof has accepted and entered upon part performance of the contract under the franchise.

As said by the Supreme Court in the very recent case of *Columbus Ry., etc., Co.* v. *Columbus, supra* (249 U. S. at p. 419, 39 Sup. Ct. 349, 63 L. Ed. —) : "That a city acting under State authority may, in matters of proprietary right, make binding contracts of the nature contained in

these ordinances, is well established by the adjudications of this court."

And, as is said by the Supreme Court in *Home Teleph. and Teleg. Co.* v. *Los Angeles,* 211 U. S. 265, 29 Sup. Ct. 50, 53 L. Ed. 176: "It has been settled by this court that the State may authorize one of its municipal corporations to establish, by an inviolable contract, the rates to be charged by a public service corporation (or natural person) for a definite term * * * and that the effect of such a contract is to suspend, during the life of the contract, the governmental power of fixing and regulating rates," citing cases.

[3, 4]  It is true that the power to fix and regulate rates of charges for a public service, just as is the power to tax or to exempt from taxation, is a police power, which is an attribute of sovereignty inherent in the State. And the rule is inflexible that municipalities have no inherent powers in such matters. In matters concerning the police power, municipalities cannot exceed the authority delegated to them. They can exercise such power only when they have been authorized so to do by the State, by constitutional ordinance or statutory enactment, and even then only to the extent they may be thus expressly authorized. Especially is the power *to regulate* such rates considered, normally, to be a continuing power to meet changing conditions of the future which cannot be foreseen. A wise public policy requires that such power should, as a rule, be reserved unfettered that it may be exercised in adjusting rates from time to time as may be fair and reasonable in the interest of the public amidst varying conditions as they arise. The longer the future period to be covered, the more imperative the need for such a safeguard, for the human vision of coming events is not far-reaching. For short periods the fixing of rates by contract may be for the best interest of the public, but that method is not favored

in the law.   For this reason the abrogation of such continuing power is never to be presumed.   The purpose on the part of the State to abrogate it or to authorize a municipality to abrogate it, even for a limited time, as for a term of years which may be covered by a franchise, is never to be assumed, for that is an extinguishment *pro tanto* of such continuing power of government.   A franchise contract which fixes irrevocably such rates as we are considering for the period covered by the franchise, unless a change thereof is consented to both by the grantor and grantee or holder of the franchise, does extinguish such governmental power *pro tanto*.   And, as is said by the Supreme Court in *Home Teleph. and Teleg. Co.* v. *Los Angeles, supra* (211 U. S. 265, 29 Sup. Ct. 50, 53 L. Ed. at p. 182) : "* * * for the very reason that such a contract has the effect of extinguishing *pro tanto* an undoubted power of government, both its existence and the authority to make it must clearly and unmistakably appear, and all doubts must be resolved in favor of the continuance of the power."   Citing numerous cases.

The authorities cited and relied on by the plaintiff in error, the said company, are very numerous, but they have all been carefully considered, and the holding of none of them goes beyond what is said in the next preceding paragraph.   They cover cases arising under many different statutory provisions, so many indeed as to render it impracticable to discuss such cases in detail in this opinion with any profit, since the distinguishing features of the various statutes would have to be developed in order to render such discussion at all helpful to a clearer view of the issues involved.   Those authorities are as follows: *Milwaukee Elec. R. & L. Co.* v. *Railroad Com.*, 238 U. S. 179, 180, 35 Sup. Ct. 820, 59 L. Ed. 1260; *City of Woodburn* v. *Public Serv. Com.*, 82 Or. 114, 161 Pac. 391, 393, L. R. A. 1917 C, 98; *Benwood* v. *Public Serv. Com.*, 75 W. Va. 127, 83 S. E. 295, L. R. A.

1915 C, 261; *Home Teleph.. & Teleg. Co. v. Los Angeles, su-*
*pra* (211 U. S. 271, 273, 29 Sup. Ct. 50, 53 L. Ed. 182) ; *City*
*of Manitowoc v. Manitowoc, etc., R. Co.,* 145 Wis. 13, 129
N. W. 925, 930; *Louisville & Nashville R. Co.* v. *Mottley,*
219 U. S. 467, 31 Sup. Ct. 265, 55 L. Ed. 297, 34 L. R. A.
(N. S.) 671; *Union Dry Goods Co.* v. *Georgia Pub. Serv.*
*Com.,* 142 Ga. 841, 83 S. E. 946, L. R. A. 1916 E, 358; *Yeat-*
*man* v. *Towers,* 126 Md. 513, 95 Atl. 158; *Minneapolis, etc.,*
*Ry. Co. v. Menasha W. W. Co.,* 159 Wis. 130, 150 N. W. 411,
L. R. A. 1915 F, 732; *State v. Superior Court,* 67 Wash. 37,
120 Pac. 861, L. R. A. 1915 C, 287, Ann. Cas. 1913 D, 78;
*Union Dry Goods Co.* v. *Georgia Pub. Serv. Com.,* 249 U. S.
116, 39 Sup. Ct. 117, 63 L. Ed. —; *Atlantic, etc., Ry. Co.* v.
*Board of Pub. Utility Com'rs* (N. J.), 104 Atl. 218; *City of*
*Portland* v. *Pub. Serv. Com.,* 89 Or. 325, 173 Pac. 1178;
*State, ex rel., City of Seattle* v. *Pub. Serv. Com.,* 103 Wash.
72, 173 Pac. 737; *City of Monroe* v. *Detroit, etc., Ry.,* 187
Mich. 364, 153 N. W. 669; *Traverse City* v. *Mich. R. R.*
*Com.,* 202 Mich. 575, 168 N. W. 481; *Sandpoint Water &*
*Light Co.* v. *Sandpoint,* 31 Idaho 498, 173 Pac. 972, L. R. A.
1918 F, 1106; *State, ex rel., City of Billings v. Billings Gas*
*Co.* (Mont.), 173 Pac. 799; *State* v. *Pub. Serv. Com.* (Mo.),
205 S. W. 36; *Salt Lake City* v. *Utah Light & Trac. Co.*
(Utah), 173 Pac. 556; and *People ex rel. Village of Glen*
*Falls* v. *Pub. Serv. Com.,* 225 N. Y. 216, 121 N. E. 777. It
appears in various ways in these causes that the municipal-
ities either were not vested with the power to contract, or,
if so, were not vested with that power unlimited. And in
the cases of the latter character, the limitation on such
power, consisting in the reservation of the right of future
exercise of the power of regulation, is disclosed in various
ways—as where a general State statute providing for the
exercise of the continuing power of regulation was in force
at the time of the grant of the municipal power in question,
or where it otherwise appears that such reservation of such

continuing power was made. None of these cases controverts the well-established rule of law above adverted to, namely, that if the municipality which grants a franchise, such as those involved in the cases before us, has expressly conferred upon it by statute the unlimited power to contract with the grantee of the franchise on the subject of fixing the rates which may be charged for public service rendered thereunder during the franchise period, and the municipality does so contract and the franchise is accepted by the grantee of it and the grantee acts under it, the contract is irrevocable during its life without the assent of the municipality, as well as of the holder of the franchise, to a change in rates, and the rates cannot be changed in violation of the franchise provisions by the consent of only one party to the franchise contract.

Most of the cases last above cited involve merely the construction of municipal charters or other statutory authority of the municipalities to make the contract as to rates in question; and in them the contract as made is either in terms not irrevocable during its life or the municipality has not been plainly authorized to make such a contract. Another circumstance may be mentioned in connection with these cases, namely: all of them deal with statutory authority where there is no constitutional provision expressly authorizing municipal action or expressly contemplating legislative enactment authorizing municipal action in the premises.

In the cases before us there is no question but that the contract as to rates as made by the franchises mentioned in the statement preceding this opinion are in their terms irrevocable during the life of such franchises, respectively.

We come, then, to consider whether the constitutional and statutory provisions quoted in the statement preceding this opinion expressly conferred upon the municipalities, which are the defendants in error, the authority to make the con-

tracts involved in these cases as binding contracts during the periods in which they purport to be binding?

Since there is no conflict between the statutes, sections 1033-d, 1033-e and 1033-f, above cited and quoted, and sections 124 and 125 of the Constitution of this State, it is unnecessary for us to determine whether such constitutional provisions alone are sufficient to expressly confer the authority in question. We, in truth, have merely to consider whether such statutes expressly confer such authority. But in construing such statutes, the fact that such constitutional provisions not only permit, but in effect are mandatory in their requirement that the legislature must enact said sections 1033-e and 1033-f, or at least some statute on the subject, so as to carry section 125 of the Constitution into effect, is illuminating upon the question we have under consideration. For we have here not merely legislative expression on the subject, but also constitutional expression.

[5, 6] Now section 124 of the Constitution, and the statute (sec. 1033-d) in the same language, undoubtedly confer upon municipalities the absolute power to prevent public utility corporations, such as the plaintiff in error company, from doing business within the municipality, by refusal of the consent mentioned therein. This power is absolute because no limitation is imposed upon it. Consequently the municipality may impose any condition it chooses upon its consent aforesaid, however unreasonable. It results from this that such power includes the power in municipalities to make a stipulation as to what the rate charges of the utility corporation shall be during the whole franchise period, as a condition upon which the consent aforesaid is given. *Manitowoc* v. *Manitowoc, etc., R. Co., supra* (145 Wis. 13, 129 N. W. 925, 140 Am. St. Rep. 1056) ; *Salt Lake City* v. *Utah L. & T. Co*. (Utah), 173 Pac. 556; *City of Detroit* v. *Railway Co..* 95 Mich. 456, 54 N. W. 958, 10 L. R. A. 79, 35 Am. St. Rep. 580; *Galveston, etc., R. Co.* v. *Galveston,*

90 Tex. 398, 39 S. W. 96, 36 L. R. A. 33; *Pacific R. Co.* v. *Leavensworth, supra* (1 Dill. 393, Fed. Cas. No. 10649) ; *Atchison S. R. Co.* v. *Nave,* 38 Kan. 744, 17 Pac. 587, 5 Am. St. Rep. 800; *Northern, etc., R. Co.* v. *Baltimore, supra* (21 Md. 93) ; *Indianapolis, etc., R. Co.* v. *Lawrenceburg,* 34 Ind. 304; *Indianola* v. *Railway Co.,* 56 Tex. 594; *City of Monroe* v. *Railway Co.,* 143 Mich. 315, 106 N. W. 704; *People* v. *Barnard,* 110 N. Y. 548, 18 N. E. 354; *Selectmen* v. *Worcester, etc., Ry. Co.,* 199 Mass. 279, 85 N. E. 507; *Omaha Water Co.* v. *City of Omaha, supra,* 147 Fed. 1, 77 C. C. A. 267, 12 L. R. A. (N. S.) 736, 8 Ann. Cas. 614; *Walla Walla* v. *Walla Walla Water Co., supra* (172 U. S. 1, 19 Sup. Ct. 77, 43 L. Ed. 341) ; *Vicksburg* v. *Vicksburg Waterworks Co.,* 202 U. S. 453, 26 Sup. Ct. 660, 50 L. Ed. 1102, 6 Ann. Cas. 253. That this was the intended effect of section 124 of our Constitution is placed beyond all question by a reading of the debates on such section in the constitutional convention prior to its adoption. 2 Debates Const. Convention, 1901-2, pp. 1960-1985. And such section of the Constitution is self-executory and needed no subsequent legislation to put it into effect. Moreover, it constitutes a limitation upon the legislative power and no subsequent legislation could take away or impair the absolute power aforesaid thus vested in municipalities. But such a power is not necessarily to be regarded as a power of contract. It is a power to impose conditions upon a consent of municipalities which they have the absolute right to withhold altogether or to grant subject to such conditions as they may arbitrarily impose, but it is not, strictly speaking, a power to contract. And, in view of the fundamental considerations aforesaid involved whenever the police power of the State is being surrendered, on principle, and in accordance with the greater weight of authority (Pond on Public Utilities, sections 510 to 523; *Manitowoc* v. *Manitowoc, etc., R. Co., supra* (145 Wis. 13, 129 N. W. 925, 140 Am. St. Rep. 1056), it does not follow

that because the power aforesaid has been thus conferred upon municipalities to make a stipulation as to what the rate charges aforesaid shall be as a condition upon which its consent aforesaid is given, that such stipulation shall be regarded as a *contract* which shall, as such, control the amount of such charges for the future after the consent aforesaid is given and the public service is being performed. The contrary seems to be the prevailing view taken by the best-considered authorities, and that we think is the true view, unless a municipal power *to contract* is plainly expressed as conferred by some other constitutional ordinance or legislative enactment on the subject. And, in the absence of such other plain expression, the continuing power of the State to supervise and regulate such rate charges for the future, to the end that they may be kept reasonable and just under changing conditions, will not be held to have been surrendered. Such continuing power, in such case, will be held to be reserved by the State; whether dormant or already conferred for its exercise upon some governmental agency of the State is immaterial. If dormant, it may, nevertheless, be infused with life by appropriate legislation and put into operation at any time in the future. And, in such case, the initial rates fixed by the franchise as a condition upon the municipal consent aforesaid, will be taken to have been fixed subject to the reserved power of the State to regulate the rates in the future as the public welfare may demand, and that status will be taken to have been so understood by the grantee as well as the grantor of the franchise. Therefore, upon the question before us of whether the State irrevocably surrendered its power of future regulation of the rates named in the particular franchises involved, we must look to constitutional and legislative expressions on the subject other than those above considered.

The provision of the charter of the town of Lexington

quoted in the statement preceding this opinion goes no farther than section 124 of the Constitution and section 1033-d of the statute law aforesaid.

[7]    Section 156(b) of the Constitution, referred to and in part quoted from in the statement preceding this opinion, does not *ex proprio vigore* have the effect of conferring on municipalities the authority to fix rates by contract. And the saving provision therein to the effect that nothing in such section shall impair the right which may theretofore have been or might thereafter be "conferred by law upon the authorities of any city, town or county to *prescribe* rules, regulations or rates of charge to be observed by any public service corporation *in connection* with any service performed by it under a municipal or county franchise  *  *  *," etc., has reference, we think, to the authority to regulate rates, etc., and not to the fixing of rates irrevocably by contract.

[8]    The general power of regulating rates of public utility companies was dormant in this State (*Commonwealth v. Va. P. & P. Co.*, 11 Va. Law Reg. 744, State Corp. Com. Rep. for 1905, p. 152) until the act of 1914 (Acts 1914, p. 673) above mentioned.    There may be some charters of municipalities in the State granting such supervisory power or restricting the municipal power to contract aforesaid. If so, the charters of the defendants in error are not among them.    There has been no general statute enacted conferring such supervisory power upon municipalities, or restricting the municipal power to contract aforesaid.

So we see, that neither under section 156(b), nor under any statute enacted in pursuance thereof, was the contract power conferred upon the municipalities (the defendants in error) of which we are in search.

[9]    We come next to consider section 156(c) of the Constitution, which is quoted in the statement preceding this opinion.    That section merely authorizes the legislature to confer upon the State Corporation Commission the

jurisdiction to *regulate* such rates as aforesaid (along with other powers of regulation not material to be mentioned) "which the State has the right to prescribe" (*i. e.*, to regulate) such rates.

It was under this section of the Constitution that said statute of 1914 was enacted. When the State first undertook to put into active effect its dormant power of regulation of rates aforesaid, it imposed the duty of its exercise upon the State Corporation Commission. And the commission has undoubted jurisdiction and authority under such constitutional and statutory provisions to exercise such supervisory power of regulation as to all such rates as have not been irrevocably fixed by franchise contracts such as aforesaid. But we do not find that such section of the Constitution or statute law confers the municipal power of contract of which we are in quest.

[10] We have now, however, to consider section 125 of the Constitution quoted in the statement preceding this opinion. We see that that section of the Constitution expressly provides that, while nothing therein "contained shall be construed as preventing the General Assembly from prescribing *additional restrictions on the powers of* cities and towns in granting franchises. * * *" (Italics supplied), every franchise, such as those involved in the cases before us, "shall * * * make * * * provision to secure efficiency of public service *at reasonable rates;* * * *" and we see that that is a power *to contract* as to the rates during the whole franchise period. And no limitation whatever is placed on such power to contract, except that the franchise period is limited so that it may not exceed thirty years, and that the franchise shall be offered for sale after due advertisement, bids therefor to be received publicly in a manner to be provided for by law. There is no question raised in the cases before us, but that such requirements were all fulfilled, in the granting of the franchises in

question. And we see from the reading of the whole of this section that it plainly expresses the intention that, in the absence of such "other restrictions (on their powers) as may be imposed by law," municipalities are intended by this section to be clothed by the legislature with the *unlimited* power *to contract* by the franchise with the grantee thereof *on the subject of fixing the rates* which may be charged for services rendered the public thereunder during the whole franchise period.

It is true that this section of the Constitution is not self-executory. It needs subsequent legislation to put into effect the power conferred upon municipalities of making the franchise contracts. Such legislation might, prior to the action of the municipalities, which are the defendants in error, in granting the franchises in question before us, have prescribed some limitations on the aforesaid power to contract, consisting of restrictions upon their power to make the franchise contracts binding during the whole franchise period, as is in effect provided in the section of the Constitution under consideration might be done; but we see, when we examine the statutes, that they did not impose any such limitation. On the contrary, sections 1033-e and 1033-f, in their provisions, quoted in the statement preceding this opinion, make it plain that the unlimited power to make such binding contracts during the whole franchise period is thereby expressly conferred upon the municipalities. So *expressly* are they authorized to make *unlimited contracts* and so binding are the contracts as such that the courts mentioned in section 1033-f are given jurisdiction by mandamus "to enforce compliance *by said cities and towns* and *by all grantees of franchises* * * * with all the terms and *contracts* and *obligations* of *either party,* as contained *in franchises.*" (Italics supplied.) The latter section of the statute further recognizes the binding nature of the franchise contract aforesaid, especially as to rates, during the

whole of the franchise period, unless, of course, it is modi-
fied by the consent of both parties thereto, of the munici-
pality as well as of the grantee or holder of the franchise;
but puts a restriction even upon the exercise on the part of
the municipality of its consent to a modification of the terms
of the contract by making the provision quoted in the state-
ment preceding this opinion, to the effect that no such con-
sent as may result in allowing "an increase in the charge
to be made  *  *  *  for the use by the public of the benefits
of such franchise" shall be given until after certain public
advertisement is made.

The case of *Commonwealth* v. *Richmond, etc., Railroad
Co.,* 115 Va. 756, 80 S. E. 796, involved such a modification
of the original franchise provisions, and this court regarded
the franchise as a *contract* with respect to the street rail-
way rates.   It is true that the question we have under con-
sideration was not directly involved in that case, but it is
mentioned because much discussed in argument before us
in the instant cases.   Further:

As the Constitution and statute law stood, at the time the
franchise contracts in question were entered into, the pro-
visions of such contract and the bond required, as set forth
in the statement preceding this opinion, were alone relied
upon to fix during the life of the franchises the rates afore-
said.   No provision was made by law restricting the power
of the municipalities to an initial fixing of such rates sub-
ject to future regulation thereof.   And no such provision
even yet exists in our statute law, although it might be en-
acted, as aforesaid.   The power is still left vested in mu-
nicipalities to irrevocably fix such rates by franchise con-
tract during the life of the contract.

We conclude, therefore, that the statute law, in existence
when and under which the franchises involved in the cases
before us were granted, expressly delegated to the munici-
palities the unlimited authority to contract with the grantee

of such franchises on the subject of fixing the rates of charges, aforesaid, thereunder during the whole of the franchise periods.

[11]    This conclusion is controlling of our decision of the cases before us for the reasons which are expressed by the Supreme Court in the case of *Columbus Ry., etc., Co.* v. *Columbus, supra* (249 U. S. at p. 421, 39 Sup. Ct. 349, 63 L. Ed. —), as follows: "* * * if a party charges himself with an obligation possible to be performed, he must abide by it unless performance is rendered impossible by the act of God, the law or the other party. Unforeseen difficulties will not excuse performance. When parties have made no provisions for a dispensation, the terms of the contract will prevail." Citing numerous cases.

In the cases before us, inadequacy of the rates to enable appellant to render efficient service, due to unforeseen change in economic conditions, is urged in argument as the gravamen of the appellant's complaint upon the facts. Such precisely was the case last cited; and the court in that case said: "It may be, and taking the allegations of the bill to be true, it undoubtedly is, a case of a hard bargain. But equity does not relieve from hard bargains simply because they are such." That statement is equally true of the jurisdiction of the State Corporation Commission in the cases before us. The franchises involved in the cases before us being contracts duly authorized as aforesaid, their provisions fixing the rates are binding during the franchise periods, unless and until they are modified by consent of both parties, the municipalities and the holder of the franchises, the former acting in that behalf in accordance with the permissive provisions of the statute on the subject aforesaid.

[12]    2. It is urged, however, for the plaintiff in error that any police power delegated to municipal corporations may be revoked at pleasure by the legislature, although the power be no longer executory and that acts done thereunder

by the municipality may be set aside or confirmed at will; and the cases of *City of Richmond* v. *R. & D. R. R. Co.*, 62 Va. (21 Gratt.) 604, 617, and *Supervisors* v. *Luck*, 80 Va. 223, are cited in support of such position. In the former case the power in question was the power to tax, which was delegated to the city in its charter, and such power, as involved in that case, was revoked before it was exercised. In the latter case the power in question was that of bridge commissioners and a board of supervisors to continue to exercise powers conferred by a statute after it was amended and virtually repealed by a subsequent statute. The only question involved was the authority for future action. This authority was held to have been revoked by the later statute. This also is a case, therefore, where the power of authority in question was revoked before it was exercised. The validity of no contract made under the prior existing authority was involved.

There is, of course, no question but that powers which are conferred upon municipalities by the legislature may be by the legislature revoked at any time; but such revocation can affect only the validity of future action of the municipalities under the revoked authority.

On principle, contracts made by municipalities under delegated authority cannot differ from contracts made by any other agent upon the question of the effect of the revocation of the authority of the agent. The revocation of the authority comes too late to affect contracts previously made in accordance with the authority. The revocation can affect only the authority of the agent to make contracts thereafter as binding on the principal. And so we find the authorities hold. Pond on Public Utilities, sec. 512.

8. In the case of *People, ex rel., W. S. Street Ry. Co.* v. *Barnard* (1888), 110 N. Y. 548, 18 N. E. 354, the conclusion was reached that the general statute law of the State on the subject of the granting and sale of franchises by

municipalities to street railway companies conferred on the municipalities the power of making contracts in the granting of such franchises. That conclusion was there reached by a consideration of the general statute law in the light of the constitutional provision on the subject. However, the constitutional provision involved in that case was confined to a prohibition of the legislature from granting the right to lay down railroad tracks without the consent of the local authorities and certain land owners; and the general statute law involved, while similar in some respects to the Virginia statute law on the subject, nowhere contained any express mention of rates of charges, except in the provision that: "The legislature expressly reserves the right to regulate and reduce the rate of fare on such railroad or railway." Laws N. Y. 1886, c. 642, §1. The case does not involve the question of whether the rate contract was irrevocable during the life of the franchise. Therefore, we do not consider that case as an authority to support the conclusion we have reached above, but we mention it as it has been much discussed in the briefs before us. Indeed, if the statute law of Virginia were no more specific on the subject in the direction of an express grant of the power of irrevocable contract by the municipality than is the statute law of New York involved in the case mentioned, we would have come to a different conclusion from that which we have reached. See also, *Quinby, etc.,* v. *Pub. Serv. Com.* (1918), 223 N. Y. 244, 119 N. E. 433; and *People* v. *Pub. Serv. Com.* (N. Y. 1919), 121 N. E. 777.

4. We should perhaps especially mention the case of *Freeport Water Co.* v. *City of Freeport,* 180 U. S. 587, 21 Sup. Ct. 493, 45 L. Ed. 679, which is not cited or relied on by counsel for the plaintiff in error, but which is frequently referred to in the authorities which are above cited as relied on by the plaintiff in error company. As that case is sometimes quoted from, it would seem as if it were in con-

flict with the other Supreme Court cases cited above and
with our conclusion on the subject of when a municipality
is authorized to make by the grant of a franchise an irrevoc-
able contract during the life of the franchise.   In that case
the charter of the city authorized it *"to contract* for a supply
of water for public use for a period not exceeding thirty
years," and it was held that such language did not in that
case confer the unlimited power to make an irrevocable
contract during such period; but such holding was reached
by the majority opinion on the ground that the city was in-
corporated under the general incorporation act of Illinois,
of which section 9, Hurd's R. S. Ill. 1917, c. 32, provided
that: "The General Assembly shall at all times have power
to prescribe such regulations and provisions as it may deem
advisable, which regulations and provisions shall be bind-
ing on any and all corporations formed under the provisions
of this act   *   *   *;" and the Supreme Court of the State
had decided that the provisions of such section 9 entered into
and formed a part of the charter of the city and that the
continuing power of regulation was thereby reserved to the
legislature of the State.   There is nothing in the holding of
the majority opinion in that case, therefore, which is in con-
flict with the settled rule on the subject, or with our con-
clusion thereon aforesaid.   There was also a minority opin-
ion delivered in that case by Mr. Justice White (afterwards
and now the chief justice), in which Justices Brewer, Brown
and Peckham concurred, taking the view that said section
9 applied only to private, not to municipal, corporations and,
hence, that the unlimited power to contract with respect
to rates was conferred on the city by its charter.   Thus the
minority opinion makes it still more clear that our conclu-
sion aforesaid is sound.

[13]   5. The authorities recognize no difference in the
power of a municipality by franchise provisions to make a
contract binding on public utility companies with respect

63

to rates to be charged the consuming public within the municipal limits from those with respect to rates to be charged the municipality itself for light or water service to it, or the like, for its streets, public buildings, etc. The municipality is regarded, for the most part, as acting in the exercise of its *business* powers in making both of such character of contracts. As said in *Illinois Trust & Savings Bank* v. *Arkansas City,* 76 Fed. 271, 22 C. C. A. 171, 34 L. R. A. 518: "A city has two classes of powers—one legislative, public, governmental, in the exercise of which it is a sovereignty and governs its people; the other proprietary, *quasi* private, conferred upon it, not for the purpose of governing its people, but for the private advantage of the inhabitants of the city and of the city itself as a legal personality. In the exercise of the powers of the former class * * * it is ruling its people and is bound to transmit its powers of government to its successive sets of officers unimpaired. But in the exercise of the powers of the latter class it is controlled by no such rule, because it is acting and contracting for the private benefit of itself and its inhabitants and may exercise the business powers conferred upon it in the same way, and in their exercise it is to be governed by the same rules that govern a private individual or corporation." Citing authorities. "In contracting for waterworks to supply itself and its inhabitants with water, the city is not exercising its governmental or legislative powers, but its business or proprietary powers. The purpose of such a contract is not to govern its inhabitants but to obtain a private benefit for the city itself and its denizens." Citing authorities. See, to same effect, 4 McQuillin on Mun. Corp., sec. 1738. So far as the public within its limits are concerned, in making such business contracts as to rates of charges to them for public service, municipalities act as trustees for the public. 12 R. C. L., sec. 15, pp. 189-190.

[14]    6. However, this must not be taken to mean that

municipalities exercise any inherent powers in such matters. For the fundamental, far-reaching and important reasons of public policy above indicated, the municipal authority to make such contracts as are under consideration, although they are business contracts, must be expressly conferred by constitutional or legislative authority; otherwise, they will not have the irrevocable feature aforesaid. But, as we have seen, such municipal authority was expressly conferred, in the cases before us, by the legislative enactment aforesaid.

7. The plaintiff in error company, however, earnestly relies upon section 164 of the Virginia Constitution of 1902 to sustain its position that the police power of the State to regulate the rates in question was not and could not have been vested in municipalities by the statute law of Virginia aforesaid, so as to authorize them to make contracts surrendering such continuing dormant power residing in the State in its sovereign capacity, without violation of such constitutional provision. Such section of the Constitution is as follows:

[15] "Sec. 164. Right of regulation and control of common carriers and public service corporations never surrendered or abridged.—The right of the Commonwealth, through such instrumentalities as it may select, to prescribe and define the public duties of all common carriers and public service corporations, to regulate and control them in the performance of their public duties, and to fix and limit their charges therefor, shall never be surrendered or abridged."

As above seen, by the Constitution of 1902 and the legislation up to that time, and indeed since, until the statute of 1914, aforesaid, no provision was made for the exercise of the power of regulation of rates of charge of such corporations as is the plaintiff in error. Section 164 of the Constitution, therefore, has reference to the theretofore unexercised and dormant power of the State to regulate rates.

But the surrender or abridgement of the power to which it refers is, of course, not such a surrender or abridgement thereof as was expressly permitted and contemplated by other sections of the same Constitution. And section 125 of the same Constitution, as we have seen, expressly permits and contemplates that the legislature, until such time as it shall itself curtail the powers of municipalities to make the binding contracts aforesaid in granting franchises, should enact the statute law aforesaid which, to the extent that the authority thereby conferred upon municipalities may have been exercised prior to such curtailment of municipal powers, did result in a surrender and abridgement of the police power in question *pro tanto*. Such abridgement and surrender of such power being so expressly permitted and contemplated by the last-named section of the Constitution, cannot be considered as prohibited by said section 164 thereof. Both sections must be construed together, and, when so construed, section 164 cannot be held to prohibit what the preceding section 125 expressly permits to be and expressly contemplates may be done.

8. It is contended by the defendants in error that it appears from the concluding provision of section 8 of the statute of 1914, aforesaid, which is quoted in the statement preceding this opinion, that said sections 1033-e and 1033-f of Pollard's Code of Virginia are therein referred to, and that the 1914 statute was not intended to, and does not in fact, confer jurisdiction upon the State Corporation Commission to regulate rates which have been fixed by the provisions of charters granted under such sections of Pollard's Code.

The question is not free from difficulty. In view, however, of the conclusions above reached, we shall not enter upon a consideration of that question.

For the foregoing reasons we find no error in the orders of the State Corporation Commission under review, save to the extent that they, without any investigation or consid-

eration thereof, refuse approval of the rates filed with the commission by the plaintiff in error which apply to services within the respective corporate limits of the defendants in error which are not attempted to be fixed or affected by the franchises involved in these cases. As to the latter rates, the commission has jurisdiction under the statute of 1914, aforesaid, and it should assume such jurisdiction, make the investigation and otherwise act with respect thereto in accordance with the provisions of the 1914 statute. With a provision in our order to such effect, the orders of the commission under review will be affirmed.

*Affirmed.*