REPORT OF DECISIONS

DETERMINED BY THE

# SUPREME COURT OF APPEALS
OF

## WEST VIRGINIA

---

## CHARLESTON.

JOHN SHRADER v. STEUBENVILLE, EAST LIVERPOOL &
BEAVER VALLEY TRACTION CO.

Submitted April 8, 1919. Decided April 22, 1919.

1. COMMERCE—*Bridge Over Waters Forming State Boundary Line—
   "Interstate Commerce."*

   A bridge across waters forming a boundary line between states
   is an instrumentality of commercial intercourse between such
   states, and traffic across it is interstate commerce. (p. 5).

2. SAME—*Interstate Commerce—"Railroad."*

   The federal Act to Regulate Commerce expressly includes within
   the scope of its provisions bridges used or operated in connection
   with any railroad, and an interurban electric railway, other than
   a street passenger railway, passing over an interstate bridge and
   participating in the interstate movement of persons and property,
   is a "railroad" within the meaning of the act, and the bridge
   over which it passes is therefore subject to the provisions of the
   act. (p. 5).

3. SAME—*Interstate Bridge—State Control.*

   No part of the business of an interstate bridge which is sub-
   ject to the provisions of the Act to Regulate Commerce is under
   the control of the state. (p. 5).

4. SAME—*Exclusive Federal Laws—Interstate Commerce—Passes.*

   A common carrier subject to the provisions of the Act to Reg-
   ulate Commerce cannot accept any compensation other than money
   for the services which it renders, and a pass issued for a non-
   monetary consideration, though valid when made, becomes invalid
   under the provisions of that act. (p. 5).

5. SAME—*"Public Service Corporation"—Operator of Toll Bridge.*

The operator of a toll bridge, whether a person, firm or corporation, is by express definition constituted a public service corporation, and as such is subject to the provisions of our Public Service Commission Act (chapter 15-O, Code), even though the structure is an interstate bridge, provided it is not one used or operated in connection with a railroad. (p. 7).

6. PUBLIC SERVICE COMMISSIONS—*Rates and Fares—Construction of Statute—Uniformity.*

In providing in section 6, ch. 15-O, Code, that no public service corporation subject to the provisions of that chapter should directly or indirectly charge or receive "a greater or less compensation" for a service rendered than it charges or receives from any other person for a like service under the same or similar conditions, the legislature was seeking through its police power to procure uniformity of charges by such companies. (p. 7).

7. SAME—*Rates and Charges—Uniformity.*

To effectuate uniformity, there must be a standard measurement applicable alike to all persons and in all circumstances and conditions. The only measure appropriate to secure such regularity and uniformity of charge for the service rendered by a commercial utility is money. (p. 7).

8. SAME—*Rates and Charges—Passes.*

Services rendered or materials furnished to a public service corporation subject to the provisions of the Public Service Commission Act must be compensated for by payment in money, not by a pass; and a contract for a pass, though valid when made, becomes illegal and unenforceable under the provisions of the act. (p. 7).

9. CONSTITUTIONAL LAW—*Impairment of Obligation of Contract—Contract of Public Service Corporation.*

A contract of a public service corporation that conflicts with public duties imposed upon it by law is not within the protection of the constitutional provision inhibiting impairment of the obligations of contracts. (p. 9).

10. COMMERCE—*Interstate Commerce—Power of Congress.*

As to those forms of interstate commerce which are of national importance, and require a general system and uniformity of regulation, the federal power is exclusive, and the state may not act even if Congress has not exerted its paramount legislative authority as to them. (p. 10).

11. SAME—*Local Matters—State Regulation.*

But where the subject is of local rather than national impor-

tance, admitting of diversity of treatment according to the special requirements of local conditions, the state may exercise its regulatory authority within reasonable limits till Congress does act. (p. 10).

12. SAME—*Interstate Toll Bridge—State Regulation.*

Some questions affecting an interstate toll bridge not used or operated in connection with a railroad, and therefore not a part of a continuous interstate carrier system, present situations essentially local and permit regulation according to local conditions. (p. 10).

13. SAME—*Interstate Bridge—State Regulation—Passes.*

Though a state cannot impose an undue burden upon interstate commerce, it lawfully may render illegal and unenforceable a pass given to a resident thereof for use over an interstate bridge not included within the scope of federal legislative enactment. (p. 10).

14. PUBLIC SERVICE COMMISSIONS—*Control of Roads and Bridges—Constitutionality of Statute.*

That part of the Public Service Commission Act, chapter 15-O, Code, here construed to prohibit the issuance and use of passes, is a general regulatory provision, sanctioned by, and not in violation of, section 24, Art. 8 of the Constitution of this state, which provides that county courts ''shall also, under such regulations as may be prescribed by law, have the superintendence and administration of the internal police and fiscal affairs of their counties, including the establishment and regulation of roads, ways, bridges, public landings, ferries and mills.'' (p. 15).

Appeal from Circuit Court, Hancock County.

Bill by John Shrader against the Steubenville, East Liverpool & Beaver Valley Traction Company. From a decree dismissing the bill and dissolving a temporary injunction, plaintiff appeals.    *Affirmed.*

*E. A. Hart* and *Lones, Hill & Davidson,* for appellant.

*W. W. Ingram* and *Billingsley, Moore & Van Fossan,* for appellee.

LYNCH, JUDGE:

The object of this appeal is to review the decree of the circuit court of Hancock County dismissing plaintiff's bill and dissolving the injunction awarded temporarily to restrain

84 W. Va.

defendant from requiring plaintiff, members of his family, guests, servants and employes to pay toll at the same rate others are charged when crossing the Ohio River on defendant's bridge from Chester, W. Va., to East Liverpool, Ohio, and from interfering in any way with the plaintiff, members of his family, guests and employes in the exercise and enjoyment of such privilege without payment of toll, as provided in a certain contract entered into December 3, 1895, between plaintiff and the East Liverpool Bridge Company, a former owner of the bridge and defendant's remote grantor.

The contract referred to, after reciting plaintiff's agreement to furnish all the materials and construct the said bridge for the East Liverpool Bridge Company in consideration of $25,000 cash and $250,000 of the stocks and bonds of the company, contained this additional stipulation: "And as a further consideration the said John Shrader is hereby given a free pass over and across said bridge, good perpetually for himself and family and guests, and for his rigs and teams, and any servant or employe, and for any rigs or teams that may be at any time in his employ." On October 27, 1905, there was a partial cancellation of the above agreement by the same parties, but the clause quoted was not disturbed, but designedly left in full force and effect as a binding contract to that extent. There is no claim of any breach of the construction contract except as regards the provision quoted.

On November 9, 1905, the East Liverpool Bridge Company by deed conveyed the bridge to the East Liverpool & Rocks Springs Street Railway Company, which in turn by deed of the same date conveyed it to the East Liverpool Traction & Light Company, and the last named company conveyed it to the defendant November 1, 1917. The contract and the various deeds were duly recorded apparently in the order of their execution, though not always on the exact dates thereof.

The decision of the lower court in effect was that the clause providing for the pass in the contract of 1895 became inoperative and no longer binding or effective, presumably because of the federal and state legislation upon the subject of free

transportation of persons and property in interstate or intrastate commerce, or both.

A bridge such as is involved in this suit is an instrumentality of interstate commerce, as settled beyond dispute in *Covington Bridge Co.* v. *Kentucky*, 154 U. S. 204. The first question presented therefore is, Do sections 1 and 6 of the Act to Regulate Commerce (8 U. S. Comp. Stat. 1916, §§ 8563, 8569 (7), pp. 9069, 9128) render illegal the provisions for the pass in the contract referred to? Section 1, prohibiting the direct or indirect issuance of any interstate free ticket, free pass, or free transportation, and section 6, prohibiting the charge of "a greater or less or different compensation for such transportation * * than the rates, fares and charges which are specified in the tariff filed and in effect at the time," are made applicable only to carriers subject to the act, which, among others, are "any common carrier or carriers engaged in the transportation of passengers or property wholly by railroad * * from one State or Territory of the United States or the District of Columbia, to any other State or Territory of the United States or the District of Columbia." (8 U. S. Comp. Stat. 1916, § 8563, p. 9054). That section further says (page 9061): "The term 'railroad', as. used in this act, shall include all bridges and ferries used or operated in connection with any railroad."

Therefore to come within the control of these sections, the bridge must be used or operated in connection with or as a part of a railroad. But there is nothing in the record other than the name of the defendant to show such use of the bridge in question. Probably the fact is that defendant does operate its traction cars over the bridge, though there is nothing to show even that, and if it does, we do not know whether it is an interurban line or merely a street railway system. If the latter, the act does not apply, for though a street railway doing a suburban as well as an urban business, and not authorized to carry freight, crosses the state line in the carriage of passengers, it has not the character of a "railroad" within the meaning of the act as it originally stood. *Omaha & Council Bluffs Street Ry. Co.* v. *Interstate*

*Commerce Commission,* 230 U. S. 324; Roberts, Federal Liability of Carriers, § 100. The opinion, however, intimated that an interurban traction line, at least one carrying both passengers and freight, might be within the terms of the act, and such now seems to be the rule followed by the Interstate Commerce Commission. *Jurisdiction over Urban Electric Lines,* 33 I. C. C. 536; *City of Steubenville, Ohio,* v. *Tri-State Ry. & Electric Co.,* 38 I. C. C. 281.

. ·Furthermore, in the construction of the federal Safety Appliance Act, which applies to any "common carrier engaged in interstate commerce by railroad" (8 U. S. Comp. Stat. 1916, § 8605, p. 9322), the courts have interpreted the word "railroad" to include interurban traction lines. *Spokane & I. E. R. R. Co.* v. *Campbell,* 217 Fed. 518, affirmed in 241 U. S. 497; *Spokane & I. E. R. R. Co.* v. *United States,* 241 U. S. 344. Similarly with respect to the term "common carrier by railroad" as used in the federal Employers' Liability Act (8 U. S. Comp. Stat. 1916, § 8657, p. 9388), the court construed the word "railroad" in the same manner. *Kansas City Ry. Co.* v. *McAdow,* 240 U. S. 51; *Spokane & I. E. R. R. Co.* v. *Campbell, supra; Washington Ry. & Electric Co.* v. *Scala,* 244 U. S. 630.

Hence if the fact had appeared that an interurban electric railway carrying passengers and freight or express passed over the bridge in question, the latter could be said to be used or operated in connection with a "railroad," and as such would be subject to the provisions of the Act to Regulate Commerce. A carrier subject to the act cannot accept any compensation other than money for the service which it renders, and a pass issued for a non-monetary consideration, though valid when made, becomes invalid under the provisions of that act. *Louisville & Nashville R. R .Co.* v. *Mottley,* 219 U. S. 467; *Chicago, Ind. & L. Ry. Co.* v. *United States,* 219 U. S. 486; *Dorr* v. *C. &O. Ry. Co.,* 78 W. Va. 150.

Besides, if the present owner of the bridge operates an interurban electric line over it for the carriage of passengers and freight, thus constituting it a "railroad" within the act, Congress by passing it has assumed control of defendant's operations, and having expressly included bridges used

in connection therewith, has put it beyond the regulatory power of the state. *N. Y. Central etc. R. R. Co.* v. *Board of Chosen Freeholders,* 227 U. S. 248.

But if as a matter of fact the traction line in question is not an interurban railway, but merely a street railway as defined in *Omaha & Council Bluffs Street Ry. Co.* v. *Interstate Commerce Commission, supra,* or if no railway of any kind crosses the bridge, then it would not be one over which Congress has exercised its superior authority, and hence arise the questions, (1) whether the legislature through its Public Service Commission Act of this state, chapter 15-0, Code 1918, has attempted to declare unlawful the use of the pass involved here; (2) if so, did the state have power to enact and enforce the penalties of the statute. Plaintiff in error strenuously insists upon a negative answer to both of these questions.

With respect to the first, sections 6 and 7, ch. 15-0, Code, are: § 6: "No public service corporation subject to the provisions of this act shall, directly or indirectly, by any special rate, rebate, drawback or other device or method, charge, demand, collect or receive from any person, firm or corporation, a greater or less compensation for any service rendered or to be rendered, than it charges, demands, collects or receives from any other person, firm or corporation for doing a like and contemporaneous service under the same or substantially similar circumstances and conditions."

§ 7: "It shall be unlawful for any public service corporation subject to the provisions of this act to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation or locality, or any particular character of traffic or service, in any respect whatsoever, or to subject any particular person, firm, corporation, company or locality, or any particular character of traffic or service, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever."

Public service corporations subject to the provisions of this act are defined by section 3 to "include all persons, firms, corporations, municipalities, and agencies engaged or employed in any business herein enumerated, or in any other

public service business whether above enumerated or not, whether incorporated or not.'' Among the businesses enumerated are: ''Common carriers, railroads, street railroads, express companies, sleeping car companies, freight lines, car companies, toll bridges, ferries,'' etc. Thus toll bridges are within the meaning of the term ''public service corporation'' as used in sections 6 and 7.

In providing in section 6 that no public service corporation subject to the provisions of the act should directly or indirectly charge or receive ''a greater or less compensation'' for a service rendered than it charges or receives from any other person for a like service under the same or similar circumstances and conditions, the legislature was seeking through its police power to procure uniformity of charges by such companies. To effectuate that purpose there must of course be an inflexible or invariable standard of measurement. The only feasible or possible method appropriate to secure regularity and uniformity is the universal medium of exchange, money. It is the only recognized basis whereby uniformity of charge can be required from all persons using the instrumentality. If one person may exchange services or commodities in return for transportation or other service, while another is required to pay cash under the same or similar circumstances, there is no way to determine with reasonable certainty whether the former is receiving his service at a greater or less rate than the latter. Rather services rendered or materials furnished ought to be compensated for by payment in money, not by a pass; and then he who furnishes either or both can purchase his right to the use of the transportation or other facilities of the company on the same basis and in like manner as other persons applying for such use. Therefore the monetary requirement is the only feasible plan whereby the legislative intent embodied in section 6 can be made certain of attainment.

It is argued, however, that section 6 of the Act to Regulate Commerce (8 U. S. Comp. Stat. 1916, § 8569 (7), p. 9128), in providing that no carrier shall charge or receive ''a greater or less or different compensation * * than the rates, fares and charges which are specified in the tariff filed and in effect

at the time," expressly establishes the monetary basis as the standard, and and in that respect is stronger than our section 6. It is true that the word "different" and the reference to the "tariff filed and in effect at the time" are not in our act, and that the United States Supreme Court in *Louisville & Nashville R. R. Co.* v. *Mottley*, 219 U. S. 467, laid great stress upon their presence, but we are of opinion that their absence from our act is not decisive. The language used is sufficiently clear and explicit to manifest an intention on the part of the legislature that all persons (with certain exceptions specified in section 20, ch. 15-0, Code) who avail themselves of the services of any company subject to the act shall be treated alike in the matter of rates and be on a plane of equality. These ends cannot be met otherwise than by requiring the service to be paid, for in money which has a certain value known to all, and not in commodities or services whose values are variant and difficult of determination. *State* v. *Union Pac. R. R. Co.*, 87 Neb. 29. And if one person is permitted to exchange his services or commodities for a pass, others might be denied the same privilege, and that would constitute ground for argument at least that the company would be according him an undue preference within the meaning of section 7 in not permitting others likewise to exchange their services or commodities for passes.

Our opinion is that the pass here involved comes within the condemnation of our own statute, and the use thereof therefore has become illegal and the contract unenforceable to that extent at least. Nor is citation of authority necessary to show that such an exercise of the police power of the state does no violence to that provision of the federal Constitution which forbids a state to impair the obligation of contracts. *Gas Co.* v. *Public Service Commission*, 73 W. Va. 571, 591; *B. & O. R. R. Co.* v. *Public Service Commission*, 81 W. Va. 457.

The second question relates to the power of this state through its legislature to declare illegal a pass over an interstate bridge. Assuming the bridge to be one not used or operated in connection with a railroad, and therefore not within the Act to Regulate Commerce, can the state in the absence

of Congressional legislation enact laws respecting it until such time as Congress may choose to assert its paramount authority?

With respect to regulation, interstate commerce may be divided into two general classes: One where the power of Congress is exclusive; the other where the state has permissive concurrent regulatory power till Congress exerts its authority in that respect. As to those forms of commerce which are of national importance and which require a general system and uniformity of regulation, the federal power is exclusive, and the state may not act even where Congress has not yet covered the field by legislation. But where the subject is of local rather than national importance, the state may exercise its regulatory authority within reasonable limits till Congress does act. *Minnesota Rate Cases,* 230 U. S. 352, 399, 400; *Port Richmond Ferry Co.* v. *Board of Chosen Freeholders,* 234 U. S. 317.

In *Covington Bridge Co.* v. *Kentucky,* 154 U. S. 204, the question related to the power of the state of Kentucky to regulate tolls on an interstate bridge built pursuant to the concurrent action of Kentucky and Ohio. It was held (at least in the absence of mutual action by both states) that it was impossible for either state to fix a tariff of charges. But the statute in that case attempted ''to reach out and secure for itself a right to prescribe a rate of toll applicable not only to persons crossing from Kentucky to Ohio, but from Ohio to Kentucky,'' a right which practically nullified ''the corresponding right of Ohio to fix tolls from her own state.'' (p. 220). The Covington Bridge Case was cited and followed in *Broadway & Newport Bridge Co.* v. *Commonwealth,* 173 Ky. 165.

The subsequent case of *Port Richmond Ferry Co.* v. *Board of Chosen Freeholders, supra,* 234 U. S. 317, held that until Congress chose to exercise its paramount power, the state of New Jersey could regulate boundary ferries between that state and New York, and prescribe rates to be charged from its shore, though it clearly intimated that New Jersey could not have regulated the rate to be charged for trips originating from the New York side. The court distinguished the

Covington Bridge Case on the ground that it attempted to regulate the tolls both from Kentucky to Ohio and from Ohio to Kentucky, while the statute involved in the later case only attempted to regulate fares on trips originating from the New Jersey shore. The rule laid down in the Port Richmond Ferry Case has been recognized in later decisions. *Sault Ste. Marie* v. *International Transit Co.*, 234 U. S. 333, 342; *Wilmington Transportation Co.* v. *Railroad Commission*, 236 U. S. 151, 154.

It is a question how far the principles stated in *Covington Bridge Co.* v. *Kentucky, supra,* have been modified by the Port Richmond Ferry Case. In an earlier decision, *Gloucester Ferry Co.* v. *Pennsylvania,* 114 U. S. 196, the state of Pennsylvania had imposed a tax upon a ferry company which did an interstate business between that state and New Jersey. The tax was held invalid as a direct burden upon interstate commerce, but the court recognized that, in view of the nature of the subject and the diversified regulation which was necessary, states were entitled to exercise a measure of regulatory power not inconsistent with federal authority. The court said, p. 217: "It is true that, from the earliest period in the history of the government, the states have authorized and regulated ferries, not only over waters entirely within their limits, but over waters separating them; and it may be conceded that in many respects the states can more advantageously manage such interstate ferries than the general government."

On the other hand, the opinion in *Covington Bridge Co.* v. *Kentucky, supra,* contained some expressions which seemed to establish the doctrine that interstate business over navigable rivers bordering two states was exclusively within the authority of Congress to regulate, and therefore was not, as declared in the Gloucester Ferry Case, subject to state regulation until Congress had exerted its authority over the matter. The doubt engendered as a result of that opinion was recognized in the later cases of *St. Clair County* v. *Interstate Transfer Co.,* 192 U. S. 454, and *New York Central R. Co.* v. *Board of Chosen Freeholders,* 227 U. S. 248, but

the court in each case declined to remove it. However, in *Port Richmond Ferry Co.* v. *Board of Chosen Freeholders, supra,* the court seems to have done so, stating the rule respecting interstate ferries not used or operated in connection with a railroad to be that in the absence of regulatory action by Congress each state can regulate such ferry as to the ferriage from its own shore. And in discussing the Covington Bridge Case, the court seems inclined to rest that opinion on the ground that the Kentucky legislation there involved was too broad in its scope, in that it purported to fix rates not only from Kentucky to Ohio, but from Ohio to Kentucky, thus practically nullifying "the corresponding right of Ohio to fix tolls from her own state." "And this," the court said. "was an adequate basis for the judgment."

Was it the intention in using that language to place interstate bridges and ferries on the same basis, permitting adjoining states to regulate them with respect to traffic primarily emanating from their respective shores, in the absence of regulatory action by Congress? We believe such to have been the purpose, and it is difficult to perceive in what respect principles applicable to the one should not apply with equal force to the other, where neither is operated in connection with a railroad. In the Port Richmond Ferry Case, p. 332, the court said: "The fundamental test, to which we have referred must be applied; and the question is whether, with regard to rates, there is any inherent necessity for a single regulatory power over these numerous ferries across boundary streams; whether, in view of the character of the subject and the variety of regulation required, it is one which demands the exclusion of local authority. Upon that question, we can entertain no doubt. It is true that in the case of a given ferry between two states there might be a difference in the charge for ferriage from one side as compared with that for ferriage from the other. But this does not alter the aspect of the subject. The question is still one with respect to a *ferry,* which necessarily implies transportation for a short distance, almost invariably between two points only, and unrelated to other transportation. It thus presents a situation essentially local requiring regulation

according to local conditions. * * If the state may exercise that power, it necessarily follows that it may not, in its exercise, derogate from the similar authority of another state. The state power can extend only to the transactions within its own territory and the ferriage from its own shore. It follows that the fact that rates were fixed by New York did not preclude New Jersey from establishing reasonable rates with respect to the ferry establishment maintained on its side.''

. If a ferry is of local importance, a bridge such as we are assuming is equally so. One bridges a stream or body of water by a movable surface, the other by a fixed and stationary surface. Each implies transportation for a short distance only. By analogy to the decision in the case last cited and to the reasoning upon which it is based, we are of opinion that the regulatory authority of this state extends at least as far as to declare illegal the use of a pass on trips across the bridge originating from this shore.

But what of its use on return trips from Ohio to West Virginia? The question was left open in the Port Richmond Ferry Case whether the authority of the state of New Jersey extended to round-trip tickets from its shore. The pass involved here closely resembles such a ticket, or rather a succession of round-trip tickets. Plaintiff is a resident of this state and uses his pass as he would a round-trip ticket to go to the Ohio side and return. His trip primarily emanates from this side, and we do not deem it a derogation of the regulatory authority of the state of Ohio to hold that our statute prohibits the use of such a pass on the bridge not only on the trip from this shore to Ohio, but the return as well, the latter being an incident of the former, and the entire passage across and back being one primarily emanating from the West Virginia shore.

Ferries and bridges across rivers forming boundaries between states are alike instrumentalities of interstate communication and commerce, whether used in connection with railroads or without such connection. The joint operation with railroads does not alter the character of such instrumentalities. It remains unchanged, although Congress may

not deem it necessary to exercise as to them the power conferred by the Constitution except when employed as indicated. The regulatory or controlling power so conferred Congress has exercised as to both ferries and bridges when so used, but not otherwise, thus warranting the conclusion that no circumstance or condition has arisen demanding its action in that regard. Until the necessity for such action has arisen and Congress has finally exerted its constitutional power, either one or both of the adjoining states properly may legislate upon the omitted subject so long as they refrain from the imposition of undue or onerous burdens upon interstate traffic. Prohibition of the issuance and use of passes, whether complimentary or given in exchange for labor, service or material, not within the exception of both federal and state statutes, does not burden such traffic directly or indirectly. Its only effect is equalization by opposite proscription against discrimination in the various forms of commercial exchange of commodities and intercourse between the states.

An interesting and illuminating discussion of a somewhat similar controversy appears in *State* v. *Faudre,* 54 W. Va. 122, involving the right of the operator of a ferry to charge a rate of ferriage from the Ohio shore, lawfully authorized by the city of Gallipolis, Ohio, in excess of that prescribed by the county court of Mason County on the opposite shore of the Ohio River. This court recognized and sustained the authority of each state to regulate ferriage charges from its shore across the common boundary, and held defendant not amenable to punishment by fine or imprisonment by reason of the collection of the excess in rates. The decision in that case is in accord with the later decision of the Supreme Court of the United States in *Port Richmond Ferry Co.* v. *Board of Chosen Freeholders, supra.* Our investigation has led to no statute of Ohio relative to the bridge in question, the greater part of which is within the territorial jurisdiction of this state.

Whether plaintiff is remediless because of the failure of part of the consideration of the bridge construction contract is not an issue raised by the pleadings. On this subject see

*Bell* v. *Kanawha Traction & Electric Co.*, 83 W. Va. 640, 98 S. E. 885. Nor is anything said herein to be understood as expressing any opinion upon the question whether this state may regulate toll rates on interstate bridges or ferries. For the Public Service Commission Act, section 5, ch. 15-0, Code, limits the power of the commission to prescribe and change only intrastate rates, tolls and charges.

Nor is the question raised here whether the legislature lawfully may take the regulation and control of bridges and ferries from the county courts of the several counties and bestow them upon the Public Service Commission, in view of that part of section 24, Art. 8, of the state Constitution, which provides that "they (county courts) shall also, under such regulations as may be prescribed by law, have the superintendence and administration of the internal police and fiscal affairs of their counties, including the establishment and regulation of roads, ways, bridges, public landings, ferries and mills." Suffice it to say in this connection that the part of the Public Service Commission Act which we have construed to prohibit the issuance and use of passes is a general regulatory provision sanctioned by the clause, "under such regulations as may be prescribed by law."

For reasons stated our opinion is to affirm the decree.

*Affirmed.*