# CHARLESTON.

MILL CREEK COAL & COKE CO. *et als.* v. PUBLIC SERVICE
COMMISSION.

Submitted September 3, 1919.    Decided October 7, 1919.

1. ELECTRICITY—*Electric Light and Power Company A "Public Service Corporation."*

    A hydro-electric company, organized in Virginia to engage in the business of a general electric lighting and power company and for the sale and disposal of its electric power to the public, and selling its product to customers in this state, is, as to its business transacted within this state, a public service corporation within the terms of Chapter 15-O, Code of West Virginia. (p. 666).

2. SAME—*Electric Current furnished by Hydro-Electric Company to Industries is a "Public Service."*

    Where a hydro-electric company, a public service corporation within the terms of chapter 15-O, Code, by its charter expressly engages to serve the public, and subjects itself unreservedly to the laws and regulations of the governmental power having jurisdiction in the place where it proposes to conduct its business, and its prolonged subsequent conduct is entirely consistent there-

with, the electric service rendered by the company to industrial concerns to be used by them for private profit is a public service within the provisions of the Public Service Commission Act, and subject to regulation by the commission. (p. 666).

3. COMMERCE—*Transmission of Electric Current from State to State is Interstate Commerce.*

The transportation or transmission of electric current from state to state through appropriate instrumentalities is commerce between the states. (p. 669).

4. SAME—*Interstate and Intrastate Commerce Distinguished.*

In determining when commerce ceases to be interstate and become intrastate, the essential character or unity of the movement is decisive. (p. 670).

5. SAME—*Transmission of Electric Current from Seller in One State to Buyer in Another is "Interstate Commerce."*

The transportation or transmission of electric current direct from the seller in one state to the consumer in another, for immediate or practically immediate use, subject only to a temporary stop en route for the purpose of reducing the current to a commercial voltage, remains interstate commerce until the commodity has reached its goal, unless theretofore sold to independent distributing companies in the latter state for resale to local consumers. (p. 671).

6. SAME—*Federal Power Exclusive Over Interstate Commerce of National Importance.*

As to those forms of interstate commerce which are of national importance, and require a general system and uniformity of regulation, the federal power is exclusive, and the state may not act, even if Congress has not exerted its paramount legislative authority as to them. (p. 671).

7. SAME—*State Regulation of Local Interstate Commerce Valid on Non-Exercise of Power by Congress.*

But where the subject is of local rather than national importance, admitting of diversity of treatment according to the special requirements of local conditions, the state may exercise its regulatory authority within reasonable limits till Congress acts. (p. 668).

8. SAME—*Regulation by State of Rates for Furnishing Electric Current in Another State is Valid.*

The regulation of the rates at which electric current transported or transmitted from one state to another shall be sold in the latter state is, so long as the rate fixed is not confiscatory

or discriminatory against citizens of another state, a matter essentially local in its nature, and not of such national importance as to require a general system and uniformity of regulation. (p. 674).

9. CONSTITUTIONAL LAW—*Private Contract Rights Must Yield to Consideration of Public Welfare.*

Private contract rights must yield to the public welfare where the latter is appropriately declared and defined and the two conflict. (p. 674).

10. SAME—*Rates Established by State for Electric Current Not Impairment of Private Rate Contract.*

Reasonable rates for electric energy, prescribed by a state in the exercise of its police power, through the instrumentality of its Public Service Commission, are not repugnant to the contract or due process of law clauses of the federal Constitution merely because, if given effect, they will supersede the rates designated in a private contract between the company and a customer, entered into prior to the enactment of the law creating the Commission. (p. 674).

11. PUBLIC SERVICE COMMISSIONS—*Findings of Fact Generally not Reviewed.*

Findings of fact by the Public Service Commission based upon evidence to support them generally will not be reviewed by this court. (678).

Petition by the Mill Creek Coal & Coke Company and others for suspension of an order of the Public Service Commission directing the continuance of a former increase of 20 per cent. in the existing rates of the Appalachian Power Company, and allowing a further increase of the same amount.     *Order affirmed.*

*A. G. Fox, Sanders & Crockett,* and *W. B. Kegley,* for petitioners.

*Geo. W. Johnson, R. Dennis Steed, R. E. Scott* and *Price, Smith, Spilman & Clay,* for respondent.

LYNCH, JUDGE:

The questions presented upon this appeal originated in an application made by the Appalachian Power Company, a Virginia corporation doing business in this state as well as in Virginia, to the Public Service Commission of West Virginia

for an increase of 30% in the rates in force December 31, 1918. Thirteen months prior to that date the Commission had ordered an increase of 20% in the rates theretofore existing, pursuant to an agreement between the power company and its customers and as an emergency measure made necessary by the war, though many of such customers, including appellants, held unexpired contracts with the company fixing lower rates to be paid for its service. The increase of 20% presumably not proving sufficient to enable the company to meet the additional costs incident to war conditions, application was made for the additional 30% increase. After full investigation and hearing the Commission by an order of April 28, 1919, directed the continuance of the former increase of 20%, and allowed a further increase of the same amount effective April 1, 1919. It is from that order that the present appeal was taken by numerous coal companies served by the power company in this state.

The Appalachian Power Company was organized in 1911 for the purpose of engaging in the business of a general electric lighting and power company "for the production of electric power intended to be used for public service." Hydro-electric stations of great capacity were constructed on New River in Virginia, and the current there generated carried into West Virginia by two high-tension transmission lines to three sub-stations in this state, where it is transformed or reduced from 88,000 volts to commercial voltages ranging from 13,200 to 110, and from these points distributed, measured and sold to the company's West Virginia consumers. These three transforming or reducing sub-stations alone, one at Switchback, one at Bluefield, and one at Coalwood, represent an investment, exclusive of generating machinery, of $400,000, $80,000 and $60,000, respectively. The Commission found that the fair value of the power company's investment as a rate base upon which it was entitled to earn a reasonable return, as of September 30, 1918, was approximately $9,860,000. It further found that the company had not during any year of its history earned a return sufficient to pay its fixed charges and to enable it to set aside a fund to cover accrued depreciation, and that the operations of the

company since it commenced business had resulted, as of September 30, 1918, in a deficit of "something in excess of $1,000,-000."

At the time of the applications for increased rates and of the orders of the Commission allowing them many of the customers of the power company were using its current under unexpired contracts having several years yet to run. These contracts definitely fixed the rates chargeable for the service rendered. The Commission, however, in effect annulled the provisions of these agreements in so far as they related to rates by authorizing a total and aggregate increase of 40%, finding that the new rates were necessary in order to enable the company to earn a fair return on its investment.

In support of their contention that the Commission exceeded its jurisdiction and powers in authorizing the increase in the face of specific rates fixed by contracts having several years yet to run protestants rely upon four propositions: (1) That the Appalachian Power Company, disposing in West Virginia of electric power generated outside of this state, is not within the purview of the West Virginia Public Service Commission Act—Chapter 15-0 of the Code; (2) that the electric power furnished in West Virginia originates at the power company's developments in Virginia, its business in this state is interstate commerce, and the Public Service Commission, therefore, has no jurisdiction in the premises; (3) that protestants' rates are fixed by contracts entered into prior to the passage of the act creating the Commission, and any interference now with such contracts would impair the obligations thereof and deprive protestants of their property without due process of law; (4) that the rates fixed are unreasonable.

With respect to the first ground relied on by petitioners, there can be no reasonable doubt. The charter of the Appalachian Power Company states that the purposes of its organization, among others, are: "To do the business of a general electric lighting and power company, with works to be purchased, leased or constructed, maintained and operated for the production of electric power intended to be used for public service, and for the sale and disposal thereof to the

public." The charter authorizes the company to transmit,. use or dispose of its electrical power or energy in the states. of Virginia, West Virginia, Tennessee and North Carolina. While it is given full power to contract with the public "for such price or prices and on such terms and conditions as to this corporation may seem proper," yet in the same connection it is provided expressly that "said company shall be bound to furnish at reasonable rates any person, company or corporation along its lines with electric energy, and to charge uniformly therefor to all persons, companies or corporations using the same under like conditions as to cost of supply; *all subject to the laws and regulations of the governmental power having jurisdiction in the place or places in which such business or businesses are conducted."* (Italics ours). A certified copy of its certificate of incorporation was duly filed with the Secretary of State of this state, and properly recorded, as required by section 30, ch. 54, Code of West Virginia. It was under such provisions as these that the power company commenced, and has continued to transact its business in this state.

Not only is the public character of the service to be rendered by the Appalachian Power Company expressly asserted in the articles of incorporation, but its subsequent acts. pursuant thereto have partaken distinctly of the same characteristics. The findings of fact of the Public Service Commission sufficiently disclose that fact: "The applicant is now serving as a public utility with light, heat and power" twelve towns in Virginia, six in West Virginia; twenty-five coal mining plants in Virginia, seventy-six in West Virginia; and the street railway system of the Bluestone Traction Company and the Princeton Traction Company. "It furnishes 60% of the power used in coal mining in the Norfolk & Western and Pocahontas territory, and all the power used in mining in the Mullens district on the Virginian Railroad, and 90% of the power used in coal mining in the Clinchfield district." Its charter requires it to serve the public along its lines at reasonable and uniform rates and subjects all phases of its business to the laws and regulations "of the governmental power having jurisdiction in the place or places

in which such business or businesses are conducted." The scope of its activities in West Virginia shows the generality of the service performed here, and state officials having occasion to deal with it, including the Public Service Commission, have recognized and treated it as a public service corporation. Moreover, a like service furnished by electric power, heat and light companies is of such a public nature as warrants the bestowal upon them of the power of eminent domain. *Pittsburgh Hydro-Electric Co.* v. *Liston* 70 W. Va. 83.

Furthermore, the power company involved here falls within the express language of the West Virginia Public Service Commission Act. Chapter 15-0, Code. Section 3 provides: "The jurisdiction of the Commission shall extend to and include: (c) Gas companies, electric lighting companies and municipalities furnishing gas or electricity for lighting, heating or power purposes; and (d) hydro-electric companies for the generation and transmission of light, heat or power. * * * The words 'Public Service Corporation' used in this act shall include all persons, firms, corporations, municipalities and agencies engaged or employed in any business herein enumerated, or in any other public service business, whether above enumerated or not, whether incorporated or not." There can be no doubt that the power company is a public service corporation within the scope of that act. *Wingrove* v. *Public Service Commission,* 74 W. Va. 190.

But protestants raise the further jurisdictional question that, granting certain phases of applicant's business to be public in nature, such as the service rendered to domestic consumers and traction companies, the furnishing of electric current to industrial concerns to be used by them for private profit is not of such a public character as to subject such service to regulation by the Commission. They contend that such service is purely a matter of private concern to be regulated by individual contract between the power company and the management of the industrial enterprise, and that if the Legislature did include that phase of applicant's business within the scope of the Public Service Commission Act, it had no constitutional authority to exercise its regulatory power with respect thereto. This question is not argued at

length by protestants, nor do they cite authority on the point. But the particular facts of the case do not necessitate an extensive consideration of the constitutional question involved, for here the company by its charter has dedicated all of its activities to. the service of the public and to regulation by it.  When, through the years of its existence, it has subjected and still is subjecting itself voluntarily in all phases of its business "to the laws and regulations of the governmental power having jurisdiction in the place or places in which such business or businesses are conducted," does it lie with this court or with those who have dealt with the company subsequent to its organization to say that the extent of its public service is more limited than the company through its recorded charter admits it to be? It has never questioned the authority of the Public Service Commission to regulate all phases of its business, and when it thus dedicates itself unreservedly to the service of the public, it is hardly fitting that this court or any minority of the public which it serves should say that the company has overstepped its powers in subjecting itself to public regulation.  It is generally the privilege of the dedicator of property or service to public use or regulation to determine, subject to the sanction of the unit of government under which it acts, the extent of that dedication.  When such dedication has been made and has received official sanction, it is conclusive against an attack of this nature. The converse of this situation is presented in the decision rendered today in *Clarksburg Light & Heat Co.* v. *Public Service Commission,* 84 W. Va.  637, 100 S. E. 551, in which the question was squarely presented whether the service of natural gas, the supply of which is limited by nature, to industrial concerns to be used by them for private profit is or is not of such a public character as to subject such service to regulation by the Commission.

With respect to the second point raised by protestants, we concur in their conclusion that the business of the power company is interstate commerce, but cannot agree that. the Public Service Commission, therefore, has no jurisdiction in the premises.  No longer can there be any doubt that the transportation or transmission of electric current from state

to state through appropriate instrumentalities is commerce between the states. *West* v. *Kansas Natural Gas Co.*, 221 U. S. 229; The *Pipe Line Cases*, 234 U. S. 548; *Western Union Tel. Co.* v. *Foster*, 247 U. S. 105; *Re Pennsylvania Gas Co.*, 225 N. Y. 397. But the more difficult question arises when it becomes necessary to determine at what point the shipment loses its interstate character and becomes merged with the general property of the state and fully subject to exclusive regulation by that state. In the present case the power used by West Virginia consumers is generated in Virginia, transmitted across the state line by high-tension wires to sub-stations in this state where the voltage is reduced to commercial form, and thence distributed to the various consumers using such power. There is no break in the essential unity of the transaction—the interposition of no intermediary which would change the essential character thereof. There is no cessation or break in the force of the current; merely a change in its form, that it may be available for use according to the needs of the consumers.

It is settled beyond all doubt by repeated decisions of the Supreme Court of the United States that it is the essential character of the commerce which determines whether it is interstate or intrastate. *Western Oil Ref'g Co.* v. *Lipscomb*, 244 U. S. 346. There an Indiana corporation, for the purpose of filling orders taken by its salesmen in Tennessee, shipped into that state a tank car of oil billed to the shipper to a point in Tennessee where part of the orders were filled, and thence rebilled to the shipper to another point in that state where the remaining orders were filled. It was held that the movement of the goods to the first point and its continuance thence to the second, the second shipment being between points within the state, were connected parts of a continuing interstate commerce movement, when considered in its entirety. The place of the rebilling was termed a "temporary stop en route."

So it has been held that a telegram forwarded by the Stock Exchange in New York City to a telegraph company in Boston, with the intention that the latter should transmit it to selected brokers in that city, approved in advance by

the Exchange, does not lose its character as a subject of interstate commerce until it reaches the brokers' offices. *Western Union Tel Co.* v. *Foster,* 247 U. S. 105. The continuity of the transaction was not broken by the translation of the code message into English, and its transmission, thus translated, to tickers in the offices of the approved brokers. As said by Justice Holmes in that case: "If the normal, contemplated and followed course is a transmission as continuous and rapid as science can make it from Exchange to broker's office, it does not matter what are the stages * * ."

In this case the transmission from hydro-electric generators in Virginia to consumers in West Virginia was as expeditious and continuous as science could make it. So far as these appellant coal companies are concerned, this is not a case where the current transported into West Virginia is sold to independent distributing companies for resale to local consumers, as was the situation in *Public Utilities Commission* v. *Landon,* 249 U. S. 236, but a direct transmission from seller to buyer, with an incidental and temporary stop en route for the purpose of transformation into a commercial voltage. As held in the case last cited, the interposition of such independent local distributing companies breaks the chain of interstate commerce. Nor is there present any evidence indicating a storage of the current in this state for later distribution to consumers, which might, though we do not decide the question, require us to hold that the interstate commerce feature of the transmission terminated at the place of storage.

We are not unmindful that the Court of Appeals of Maryland in a recent decision, *West Virginia & Maryland Gas Co.* v. *Towers,* 106 Atl. 265, has held that where gas is transported from West Virginia to Maryland in high-pressure mains, and at various points in the latter state reduced to a lower pressure for local consumption, such reduction terminates the interstate commerce portion of the transportation. At the time that opinion was written the Supreme Court of the United States had not yet decided the case of *Public Utilities Commission* v. *Landon, supra.* We are, therefore, not disposed to adopt the conclusion reached in the Tower case, but

rather to follow what we understand to be the rule laid down in *Public Utilities Commission* v. *Landon, supra,* and *Re Pennsylvania Gas Co.,* 225 N. Y. 397, affirming 171 N. Y. Supp. 1028, namely, that the transportation or transmission of such commodities as gas or electricity across state lines, direct from seller to consumer, for immediate or practically immediate use, remains interstate commerce until the commodity has reached its goal, unless theretofore sold to independent distributing companies for resale to local consumers, or, possibly, unless stored in the state of distribution for a period of such length that it can fairly be said to have lost its original character and to have become merged with the general property of the state.

But, though interstate commerce is involved, the state is not necessarily deprived of the right to regulate and supervise under its police power. That which is attempted here is the regulation of the rates at which electric power produced in Virginia shall be sold in West Virginia. It is settled law that the police power of the state embraces regulations designed to promote the public convenience or the general welfare or prosperity, as well as those in the interest of the public health, morals and safety. *Lake Shore & Mich. Southern Ry.* v. *Ohio,* 173 U. S. 285, 292; *C. B. & Q. Ry.* v. *Drainage Commissioners,* 200 U. S. 561, 592; *Bacon* v. *Walker,* 204 U. S. 311, 317; *Chicago & Alton R. R.* v. *Tranbarger,* 238 U. S. 67, 77. And it is clear that the regulation of the rates of public utilities is for the public convenience and general welfare, and hence a proper exercise of the police power of the state. *City of Benwood* v. *Public Service Commission,* 75 W. Va. 127; *Virginia-Western Power Co.* v. *Commonwealth,* 125 Va. 469, 99 S. E. 723. See also *German Alliance Ins Co.* v. *Kansas,* 233 U. S. 389.

But not every exercise of the police power affecting interstate commerce is valid. No direct or undue burden may be imposed. Since the clarifying opinion of the United States Supreme Court in the *Minnesota Rate Cases,* 230 U. S. 352, much of the vagueness and ambiguity as to the respective powers of state and federal governments over interstate commerce have been removed. At page 399 of the opinion

the court says: "It has repeatedly been declared by this court that as to those subjects which require a general system or uniformity of regulation the power of Congress is exclusive. In other matters, admitting of diversity of treatment according to the special requirements of local conditions, the states may act within their respective jurisdictions until Congress sees fit to act; and, when Congress does act, the exercise of its authority overrides all conflicting state legislation."

Again at page 402 it is said: "But within these limitations there necessarily remains to the states, until Congress acts, a wide range for the permissible exercise of power appropriate to their territorial jurisdiction, although interstate commerce may be affected. It extends to those matters of a local nature as to which it is impossible to derive from the constitutional grant an intention that they should go uncontrolled pending federal intervention. * * * Further, it is competent for a state to govern its internal commerce, to provide local improvements, to create and regulate local facilities, to adopt protective measures of a reasonable character in the interest of the health, safety, morals and welfare of its people, although interstate commerce may incidentally or indirectly be involved. * * * Where the subject is peculiarly one of local concern, and from its nature belongs to the class with which the state appropriately deals in making reasonable provision for local needs, it cannot be regarded as left to the unrestrained wills of individuals because Congress has not acted, although it may have such a relation to interstate commerce as to be within the reach of the federal power."

Congress has never asserted its paramount power over interstate transmission of electric power; hence it only remains to consider whether the regulation of rates at which electric current shall be sold is essentially local, or of such national importance as to require a general system or uniformity of regulation. The vital distinction should be noted between regulation of rates of transportation and of the rates at which a commodity shall be sold. Transportation across state lines, involving as it frequently does many or all states, is

generally a matter of national importance requiring uniformity of regulation respecting the rates thereof, and hence is usually beyond the regulatory power of the state. Because of the very nature of the subject matter conflicting state regulations respecting rates ordinarily would result in discord and chaos. There are instances, however, where even in such cases the regulatory power of the state has been sustained. *Port Richmond Ferry Co.* v. *Board of Chosen Freeholders,* 234 U. S. 317. See also *Shrader* v. *Steubenville, etc. Traction Co.,* 84 W. Va. 1, 99 S. E. 207.

In fixing the rates of sale, however, as distinguished from rates of transportation, the duty regulated is of an entirely different nature. The duty of the power company to sell at reasonable rates was one owed both to citizens of Virginia and to the public in this state. But the two duties do not overlap as they do where rates of transportation are concerned. The price at which a commodity is sold is essentially local, affecting chiefly those in the community where it is made, and only incidentally, if at all, touching those outside of the community. So long as the rate fixed is not discriminatory or confiscatory, but yields a fair return upon the valuation of the property, it throws no burden upon citizens of other communities or states. As said in *Re Pennsylvania Gas Co.,* 225 N. Y. 397, respecting the regulation of the sale of gas imported from another state: "It is idle to speak of the need of uniformity of action by states of equal competence when there is only one state whose action is involved. But even within the state diversity rather than uniformity is exacted by the conditions of the business. Rates adequate in one city are inadequate in another. The local needs are best known to local agencies of government. No central authority acting for the nation as a whole will readily discern them." A similar conclusion was reached in *Manufacturers' Light & Heat Co.* v. *Ott,* 215 Fed. 940. The local regulation stands until Congress occupies the field.

But protestants further claim that their rates are fixed by contracts entered into prior to the passage of the Public Service Commission Act, and any interference with such contracts would impair the obligations thereof and deprive

petitioners of their property without due process of law. Even as to this point we are unable to concur in their contention. Pursuant to its police power the state through its Legislature bestowed upon the Public Service Commission in section 5, ch. 15-0, Code, power to "change any intrastate rate, charge or toll which is unjust or unreasonable, and may prescribe such rates, charge or toll as would be just and reasonable, and change and prohibit any practice, device or method of service in order to prevent undue discrimination or favoritism as between persons, localities or classes of freight." In addition, section 22 empowers the Commission to "enforce, originate, establish, modify, change, adjust and promulgate tariffs, rates, joint rates, tolls and schedules for all public service corporations * * *; and whenever the Commission shall, after hearing, find any existing rates, tolls, * * * unjust, unreasonable, *insufficient* or unjustly discriminatory, or otherwise in violation of any of the provisions of this act, the Commission shall by an order fix reasonable rates * * * to be followed in the future in lieu of those found to be unjust, unreasonable, *insufficient,* * * *." (Italics ours). Clearly these sections bestow upon the Commission authority to change rates that are unjust, unreasonable or insufficient, as it has found these rates to be, unless bound by the contracts previously entered into between applicant and protestants.

If the point were not so seriously pressed, it would be thought unnecessary to enter into any extended discussion of the question. In *Manigault* v. *Springs,* 199 U. S. 473, 480, the court said: "It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the state from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected. This power, which in its various ramifications is known as the police power, is an exercise of the sovereign right of the government to protect the lives, health, morals, comfort and general welfare of the people, and is

paramount to any rights under contracts between individuals.''

In *Chicago & Alton R. R. Co.* v. *Tranbarger,* 238 U. S. 67, 76-77, it is said: '' It is established by repeated decisions of this court that neither of these provisions (the contract and due process clauses) of the federal Constitution has the effect of overriding the power of the state to establish all regulations reasonably necessary to secure the health, safety, or general welfare of the community; that this power can neither be abdicated nor bargained away, and is inalienable even by express grant; and that all contract and property rights are held subject to its fair exercise. * * * And it is also settled that the police power embraces regulations designed to promote the public convenience or the general welfare and prosperity, as well as those in the interest of the public health, morals or safety.''

We have held in the case of *City of Benwood* v. *Public Service Commission,* 75 W. Va. 127, that the rate-making power is an incident of the police power of the state, and may be exercised without impairing the obligation of contracts or depriving of property without due process of law within the meaning of the federal and state Constitutions. Is it not proper that it be so? Surely it is in the interest of public convenience and of the general welfare that rates of public utilities be subject to regulation, both as a protection against extortionate charges and at the same time for the purpose of safeguarding to a utility so restricted a reasonable return upon its investment. It must of course be recognized that a peculiar sanctity inheres in contracts entered into between parties competent to contract, and that the obligations thereby imposed will not lightly be disturbed. But the same policy that forbids to a utility total freedom of action likewise limits the extent to which contracts with a utility will be recognized when the public need necessitates a partial or total annulment. The duty of the utility to subordinate its right of control over rates in the interest of the public welfare is balanced by a corresponding duty on the part of individuals contracting with such utility to subordinate their rights of contract to the same public

welfare   The police power of the state is impartial between utility and contractors, requiring both to surrender rights for the general weal.   The public need to preserve the utility in strong financial condition in order that it may better serve is frequently as important as the need to guard the public against extortion.   The right of the utility to protection must not be permitted to grow dim in the presence of that other and more popular right of exercising a control over its functions.   Both subserve the same public purpose.   From the findings of the Commission showing the unfavorable financial condition of the power company it is apparent that the public interest will be better served by permitting a fair return on the property valuation over and above ordinary expenses, than by requiring the company to serve without return, to the possible ruin of those who have invested therein, and to the discouragement of others from embarking upon similar enterprises.

A case quite analogous to this was recently decided in *Union Dry Goods Co.* v. *Georgia Public Service Corporation,* 248 U. S. 372, affirming 145 Ga. 658.   There the state of Georgia, through its Railroad Commission, fixed reasonable rates to be charged by a utility for supplying electricity to the inhabitants of a city, which superseded lower rates agreed upon in an existing time contract made previously between the company and a consumer.   That result, however, was held to be a legitimate effect of a valid exercise of the police power, not impairing the obligation of contract or depriving the consumer of property without due process of law.   See also *Portland Ry. Co.* v. *Railroad Commission,* 229 U. S. 397, 412; *United Fuel Gas Co.* v. *Public Service Commission,* 73 W. Va. 571, 591; *B. & O. R. R.* v. *Public Service Commission;* 81 W. Va. 457; *Raymond Lumber Co.* v. *Raymond Light & Water Co.,* 92 Wash. 330; Note to *Pinney & Boyle Co.* v. *Los Angeles Gas & Electric Corp.,* L. R. A. 1915-C 282.

But it is said the contracts in this case were entered into before the Public Service Commission law was enacted, and, therefore, are on a different and higher plane than those of subsequent date.   To adopt such a holding would be to per-

mit private contracts to dispossess the state of a portion of its police power, where the statute enacted pursuant to that power was subsequent to such contracts. That would result in discrimination of the worst type, when the service rendered by a utility is required by law to be without discrimination. The Commission might authorize a rate, which, according to its estimate, would yield a reasonable return, but those who were so fortunate as to possess contracts with the utility would be entirely without the scope of such order, and would pay for the service at a rate lower than is paid by those subject to the Commission's order. The resulting difference between the estimated and actual yield would necessarily be made up by a still higher rate to be paid by those not holding such contracts. In other words, the effect would be to recognize the contract action of individuals as of superior dignity to the police power of the state, a result tantamount to a denial of sovereignty in the state in the exercise of one of its most sacred and sovereign powers. Such an argument is untenable. *City of Benwood* v. *Public Service Commission, supra,* where the franchise agreement involved was entered into prior to the enactment of the Public Service Commission Act; *Shrader* v. *Steubenville, etc. Traction Co.,* 84 W. Va. 1, 99 S. E. 207 ;*Yeatman* v. *Public Service Commission,* 126 Md. 513.

There is presented here no question involving the capacity of the state to contract away its right to the proper exercise of its police power, such as was presented in *Interurban Ry. & Terminal Co.* v. *Public Utilities Commission,* 98 Oh. St. 287, and *Virginia-Western Power Co.* v. *Commonwealth,* 125 Va. 469, 99 S. E. 723. Nor is any such question raised as was before the Supreme Court of the United States in *Columbus, Ry. Power & Light Co.* v. *City of Columbus,* 249 U. S. 399, recently decided.

The last ground upon which protestants attack the order of the Commission is that the rates allowed are unreasonable. The Commission found as a fact that the fair value of the power company's investment as a rate base, upon which it was entitled to earn a reasonable return, as of September 30, 1918, was approximately $9,860,000. It further found that

the company had not earned during any year of its history a return sufficient to pay its fixed charges and to enable it to set. aside a fund to cover accrued depreciation, and that the oper- tions of the company since it commenced business had re-. sulted, as of September 30, 1918, in a deficit something in ex-. cess of $1,000,000. Under the rates allowed by the Commis-. sion it is estimated that the company will be enabled "to pay its operating expenses and in addition thereto earn a net re- turn of approximately 8% upon the value of its investment." There being evidence to support this finding, it will not be· reviewed by this court. *Norfolk & Western Ry. Co.* v. *Public Service Commission,* 82 W. Va. 408. The general subject of· the conclusiveness of orders of the Public Service Commis- sion in this court is more fully discussed in *United Fuel Gas· Co.* v. *Public Service Commission,* 73 W. Va. 571, 582-583.

For the reasons stated we affirm the order of the Commis-. sion.                                              *Order Affirmed.*